[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 5, 2007
THOMAS K. KAHN
CLERK

No. 06-15303

_____

D. C. Docket No. 05-01002-CV-ORL-28-JGG

JEANETTE MCMAHON,
as Personal Representative of the Estate of
Michael McMahon,
TRACY GROGAN,
as Personal Representative of the Estate of Travis
Grogan,
SARAH MILLER,
as Personal Representative of the Estate of Harley
Miller,

Plaintiffs-Appellees,

versus

PRESIDENTIAL AIRWAYS, INC.,
a Florida corporation,
AVIATION WORLDWIDE SERVICES, LLC,
a Florida limited liability company,
STI AVIATION, INC.,
a Florida corporation,
AIR QUEST, INC.,
a Florida corporation,

Defendants-Appellants,

BLACKWATER LODGE & TRAINING CENTER, INC.,
a foreign corporation,

Defendant.

Appeal from the United States District Court
for the Middle District of Florida

_____

**(October 5, 2007)**

Before ANDERSON and MARCUS, Circuit Judges, and COX, Senior Circuit Judge.

ANDERSON, Circuit Judge:

On November 27, 2004, three soldiers in the United States Army serving in Afghanistan — Lieutenant Colonel Michael McMahon, Chief Warrant Officer Travis Grogan, and Specialist Harley Miller — died when the airplane that was transporting them crashed into the side of a mountain. The plane was owned and operated by defendant-appellant Presidential Airways, Inc. ("Presidential").[1] The soldiers' survivors (collectively, "McMahon") filed a wrongful death action in state court against Presidential and appellants Worldwide Services, LLC; STI Aviation, Inc.; and Air Quest, Inc. (also subsidiaries of Presidential's parent company, all hereinafter referred to collectively as "Presidential").[2] After removing the case to the federal district court for the Middle District of Florida, Presidential moved to

---

[1] Three Presidential employees, including the two pilots and a flight mechanic, also perished in the crash.

[2] McMahon also brought suit against Blackwater Lodge & Training Center, Inc., but her claims against Blackwater were dismissed for lack of personal jurisdiction.

dismiss, arguing that the suit is barred by the principles of Feres v. United States, 340 U.S. 135, 71 S. Ct. 153 (1950), the political question doctrine, and the combatant activities exception to the Federal Tort Claims Act (FTCA).  The district court denied the motion.  Presidential now appeals.

McMahon's complaint alleges that Presidential entered into a contract with the Department of Defense ("DOD") to provide air transportation and other support services in aid of the military mission in Afghanistan.  A Statement of Work ("SOW") governed the relationship between Presidential and the U.S. military. Presidential agreed to furnish "all fixed-wing aircraft, personnel, equipment, tools, material, maintenance, and supervision necessary to perform Short Take-Off and Landing (STOL) passenger, cargo, or passenger and cargo air transportation services" between various locations in Afghanistan, Uzbekistan, and Pakistan. DOD directed what missions would be flown, when they would be flown, and what passengers and cargo would be carried.

The SOW provided that Presidential would appoint a project manager to oversee its performance of the contract.  Presidential was required to "develop and implement a commercial quality control plan to ensure safe and reliable air transportation in accordance with FAR 135 and 32 CFR 861."  FAR 135 is Part 135 of the civilian Federal Air Regulations, which governs the "commuter or on-

demand operations" of commercial operators. 14 C.F.R. § 135.1. 32 C.F.R. § 861 contains the DOD's own standards for commercial carriers. This regulation required Presidential to "supervise crew selection," "ensure the risk associated with all flight operations is reduced to the lowest acceptable level," "ensure that applicants [for flight crew] are carefully screened," and "ensure[] the proper pairing of aircrews on all flights," among other duties. 32 C.F.R. § 861.4.

The SOW also contained more specific restrictions on Presidential's operations. It dictated how much rest crews had to receive between flights; described specifications for the planes Presidential was to use; and set out minimum and maximum limits on passengers and cargo per mission. Presidential had the ultimate authority to "refuse to fly any mission for safety reasons" (although each such mission had to be rescheduled).

McMahon alleges that on November 27, 2004, Presidential was scheduled to transport the three soldiers from Bagram Airfield in northern Afghanistan to Farah, in western Afghanistan. The aircraft chosen for the flight was a CASA 212-CC, twin-engine, turboprop, fixed-wing aircraft registered with the FAA. McMahon claims that the flight crew requested a southern departure route from Bagram, but then in fact departed in the opposite direction, on a northerly route. McMahon alleges that the crew then turned west to go to Farah, entered a canyon of rapidly

4

rising terrain, and (while attempting to execute a 180-degree turn) crashed into the face of a 16,580-foot mountain. None aboard survived.

The soldiers' survivors filed suit against Presidential in state court, seeking damages under Florida's wrongful death statute. Presidential removed the case to the federal district court for the Middle District of Florida under the federal officer removal statute. 28 U.S.C. § 1442(a)(1). The district court denied McMahon's motion to remand the case to state court. McMahon then filed an amended complaint in the district court alleging that Presidential negligently hired and trained the flight crew, negligently assigned the flight crew, negligently planned the route, negligently equipped the aircraft, and otherwise negligently operated the aircraft.[3]

Presidential moved to dismiss the case under Rules 12(b)(1) and 12(b)(6). First, Presidential argued that it was entitled to immunity under the principles of Feres v. United States, 340 U.S. 135, 71 S. Ct. 153 (1950). That case bars soldiers from suing the United States for injuries they incur incident to their military service. Presidential claimed that it was entitled to the government's Feres immunity under a theory of derivative sovereign immunity. Presidential also

---

[3] McMahon does not allege that combat activities in Afghanistan had anything to do with the plane crash, and does not allege that any action performed, dictated, or controlled by the military caused the accident.

argued that the political question doctrine barred the suit. Finally, Presidential argued that the case should be dismissed under Rule 12(b)(6) because McMahon's claims were preempted by the FTCA's combatant activities exception, 28 U.S.C. § 2680(j).

In response, McMahon sought to convert the Rule 12(b)(6) motion to one for summary judgment by attaching affidavits and exhibits originally introduced in support of her motion for remand. The district court declined to convert the motion and, on Presidential's motion, struck the extraneous evidence.

The district court then denied Presidential's motion to dismiss.[4] The court rejected Presidential's claim to <u>Feres</u> immunity because it concluded that <u>Feres</u> was only available in suits against the federal government or its employees. The court concluded that McMahon's suit did not present a nonjusticiable political question because it did not yet appear that her tort claims against a private contractor would require the court to examine the judgments or strategy of the United States military. The court also refused to recognize a preemption defense based on the combatant

---

[4] Before ruling on Presidential's motion to dismiss, the district court invited the United States to intervene in the case. The government declined to intervene, but did request that four security-related documents remain undisclosed under a protective order.

Because the district court had, on Presidential's motion, struck McMahon's extrinsic evidence, the court looked only to the face of the complaint, the contract, and the Statement of Work in denying the motion to dismiss. The district court considered the SOW because both parties had cited it during the hearing on the motion, and thus had waived any possible objection to its being considered.

6

activities exception, finding that preemption was not warranted for suits arising out of services contracts.[5]  Presidential has brought this interlocutory appeal of the district court's denial of its motion to dismiss.

We organize this opinion as follows:

I. Derivative Feres immunity

A. Interlocutory jurisdiction

B. Derivative Feres immunity

1. Feres doctrine
2. Derivative sovereign immunity
3. Application of Feres rationales to private contractor agents
4. Some form of immunity may be appropriate for private contractor agents
    a. Incident-to-service test
    b. Feres as a basis for private contractor immunity where sensitive military judgments may be involved

II. Political question doctrine

A. Interlocutory jurisdiction

B. Political question doctrine

1. Will the case involve a decision that has been constitutionally committed to another branch?
2. Does the suit involve a lack of judicially discoverable and manageable standards?
3. Other Baker factors

_____

[5] But see Hudgens v. Bell Helicopters/Textron, 328 F.3d 1329 (11th Cir. 2003).

7

III. Preemption based on the combatant activities exception

IV. Conclusion

We address each issue in turn.

I. Derivative <u>Feres</u> immunity

A. Interlocutory jurisdiction

We first consider our jurisdiction over this interlocutory appeal. Under 28 U.S.C. § 1291, we have "jurisdiction of appeals from all final decisions of the district courts . . . , except where a direct review may be had in the Supreme Court." Normally, an order by the district court is not considered "final" and appealable unless it "ends the litigation on the merits and leaves nothing more for the court to do but execute the judgment." <u>Digital Equip. Corp. v. Desktop Direct, Inc.</u>, 511 U.S. 863, 867, 114 S. Ct. 1992, 1995 (1994) (<u>quoting</u> <u>Catlin v. United States</u>, 324 U.S. 229, 233, 65 S. Ct. 631, 633 (1945)). The district court's pretrial denial of derivative <u>Feres</u> immunity does not qualify as a final judgment under the normal rule.

Presidential instead argues that its appeal is proper under the collateral order doctrine. The collateral order doctrine — a "practical construction" of the final

decision rule — permits appeals from "a small category of decisions that, although they do not end the litigation, must nonetheless be considered 'final.'" Swint v. Chambers County Comm'n, 514 U.S. 35, 42, 115 S. Ct. 1203, 1207-08 (1995). An interim decision is appealable as a collateral order only if it "(1) conclusively determines the disputed question, (2) resolves an important issue completely separate from the merits of the action, and (3) is effectively unreviewable on appeal from a final judgment." Sell v. United States, 539 U.S. 166, 176, 123 S. Ct. 2174, 2182 (2003) (punctuation and citation omitted). Decisions that satisfy this test are deemed "too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." Will v. Hallock, 546 U.S. 345, 349, 126 S. Ct. 952, 957 (2006) (punctuation and citation omitted).

Presidential argued in the district court that it has immunity under the principles of Feres v. United States, 340 U.S. 135, 71 S. Ct. 153 (1950). In Feres, the Supreme Court held that the government is immune from claims brought by soldiers for their service-related injuries, despite the waiver of sovereign immunity contained in the Federal Tort Claims Act. Id. at 146, 71 S. Ct. at 159. Presidential argues that it is a common law agent of the federal government, entitled to claim the same immunity from soldiers' service-related tort suits.

Presidential's claim to derivative <u>Feres</u> immunity qualifies as a collateral order.  A party is entitled to a collateral order appeal when it has a substantial claim to a true immunity from suit: i.e., an immunity that not only insulates the party from liability, but also prevents the party from being exposed to discovery and/or trial.[6]  Courts have recognized a number of immunities from suit, all of which protect important interests that would be irrevocably lost if the holder of the immunity were erroneously required to stand trial.  <u>See, e.g.</u>, <u>Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.</u>, 506 U.S. 139, 144, 113 S. Ct. 684, 687 (1993) (Eleventh Amendment immunity); <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526-

---

[6] A substantial claim to immunity from suit, not immunity itself, is the basis for a collateral order appeal.  <u>See</u> <u>Nixon v. Fitzgerald</u>, 457 U.S. 731, 743, 102 S. Ct. 2690, 2698 (1982) ("In light of the special solicitude due to claims **alleging** a threatened breach of essential Presidential prerogatives under the separation of powers, . . . we conclude that petitioner did present a 'serious and unsettled' and therefore appealable question to the Court of Appeals.") (citation omitted) (emphasis added); <u>Cohen v. Beneficial Indus. Loan Corp.</u>, 337 U.S. 541, 547, 69 S. Ct. 1221, 1226 (1949) (granting collateral order review to a "serious and **unsettled** question") (emphasis added); <u>In re Sealed Case No. 99-3091</u>, 192 F.3d 995, 999 (D.C. Cir. 1999) ("We think that OIC's substantial claim of immunity from the proceedings ordered by the district court suffices to entitle OIC to an interlocutory appeal."); <u>see also</u> <u>Van Cauwenberghe v. Biard</u>, 486 U.S. 517, 524, 108 S. Ct. 1945, 1950 (1988) ("For purposes of determining appealability, therefore, we will assume, but do not decide, that petitioner has presented a substantial claim of immunity from civil service of process that warrants appellate consideration.").

Of course, the natural result of our disposition is that an interlocutory appeal by a private military contractor asserting derivative <u>Feres</u> immunity will, in the future, be unnecessary because the claim to immunity based on <u>Feres</u> will no longer be substantial in this Circuit.  We have previously held that we had collateral order jurisdiction over an "important issue of first impression" even though there would, as a practical effect, be "little need for future interlocutory appeals" under our disposition of that case.  <u>United States v. Wilk</u>, 452 F.3d 1208, 1220 n.18 (11th Cir. 2006).

27, 105 S. Ct. 2806, 2815-16 (1985) (qualified immunity of federal officer); Nixon v. Fitzgerald, 457 U.S. 731, 743, 102 S. Ct. 2690, 2698 (1982) (immunity of President from civil damages). Because immunity from suit entails a right to be free from the burdens of litigation, an erroneous denial cannot be redressed through review of the final judgment, and therefore must be reviewed on interlocutory appeal.

Presidential has made out a substantial claim to immunity from suit. The government's Feres immunity from soldiers' service-related tort claims is justified, in part, by the need to avoid judicial interference with military discipline and sensitive military judgments. Service-related tort claims are often "the types of claims that, if generally permitted, would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness." United States v. Johnson, 481 U.S. 681, 690, 107 S. Ct. 2063, 2069 (1987) (punctuation and citation omitted). The Court has suggested that these interests would be threatened not only by the end result of a lawsuit, but also by the process, including the prospect of "compelled depositions and trial testimony by military officers concerning the details of their military commands." United States v. Stanley, 483 U.S. 669, 682-83, 107 S. Ct. 3054, 3063 (1987). As a result, "[e]ven putting aside the risk of erroneous judicial conclusions (which would becloud military decisionmaking), the

11

mere process of arriving at correct conclusions would disrupt the military regime."

Id. at 683, 107 S. Ct. at 3063.

As we discuss more fully below, service-related tort suits against private contractors may sometimes threaten interference with sensitive military decisions. And, pursuant to the reasoning in Stanley, the litigation process itself could conceivably cause intolerable interference with those sensitive military judgments. Presidential has therefore stated a substantial claim to a true immunity from suit, such that an erroneous denial would be "effectively unreviewable on appeal from a final judgment." Sell, 539 U.S. at 176, 123 S. Ct. at 2182 (punctuation and citation omitted). Presidential's claim thus satisfies the third collateral order factor.[7]

Presidential's claim also satisfies the second factor. Avoiding judicial interference with sensitive military judgments is clearly an "important" interest. Id.

_____

[7] We recognize that a party must do much more than allege a "right not to stand trial" in order to bring a collateral order appeal. The Supreme Court has observed that "virtually every right that could be enforced appropriately by pretrial dismissal might loosely be described as conferring a 'right not to stand trial.'" Digital Equipment, 511 U.S. at 873, 114 S. Ct. at 1998. As a result, to prevent the erosion of the final judgment rule, "it is not mere avoidance of a trial, but avoidance of a trial that would imperil a substantial public interest, that counts when asking whether an order is 'effectively' unreviewable if review is to be left until later." Will, 546 U.S. at 353, 126 S. Ct. at 959.

But among the "particular value[s] of a high order" that the Court has deemed to satisfy the third Cohen factor is "honoring the separation of powers." Id. at 352, 126 S. Ct. at 959; see also Nixon, 457 U.S. at 743, 102 S. Ct. at 2698. Because potential interference with sensitive military judgments implicates separation of powers, Presidential has made out a substantial claim of interference with a value of a high order, such that its claim satisfies the Supreme Court's test under Will.

It is also "completely separate from the merits of the action," id., because whether the suit is service-related (the test for Feres immunity in its usual formulation) does not significantly overlap with the merits of the tort suit.[8]  Finally, Presidential's claim satisfies the first factor.  Even if the district court reconsidered its decision after the motion to dismiss but prior to trial, its decision for the time being is "conclusive" because it threatens to expose the contractor to arguably harmful discovery in the interim.  Id.; see also Mitchell, 472 U.S. at 527, 105 S. Ct. at 2816.  Accordingly, because all three factors are satisfied, we have jurisdiction over the district court's denial of derivative Feres immunity under the collateral order doctrine.[9]

## B. Derivative Feres immunity

Presidential's primary argument on appeal is that it was a common law agent of the federal government at the time of the accident, and is therefore entitled to the

---

[8] As we discuss below, we ultimately reject Presidential's claim of entitlement to the full range of the service-related Feres immunity, and indeed reject any derivative Feres immunity at all for private military contractors.  However, our ultimate rejection of Presidential's position does not retroactively nullify the substantial claim as of the filing of the appeal.

[9] Two circuit courts have concluded, for essentially the same reasons, that the denial of a different sort of immunity also grounded in the Feres policies is immediately appealable under the collateral order doctrine.  See Dibble v. Fenimore, 339 F.3d 120, 125 (2d Cir. 2003) (holding collateral order doctrine applied to denial of alleged immunity, grounded in Feres, on part of superior officer against suit brought by inferior officer); Lutz v. Sec'y of the Air Force, 944 F.2d 1477, 1484 (9th Cir. 1991).

13

sovereign immunity the government might have under the Feres doctrine. Presidential's argument relies on the doctrine of derivative sovereign immunity. The existence and scope of derivative Feres immunity are questions of first impression in this Court.[10]

1. Feres doctrine

The Feres doctrine is a judicially created exception to the federal government's waiver of sovereign immunity for common law torts. In general, the United States has waived its sovereign immunity from state law tort suits "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The Federal Tort Claims Act contains a number of explicit exceptions to this waiver of sovereign immunity, such as the

---

[10] The Supreme Court adverted to the issue in Boyle v. United Technologies Corp., 487 U.S. 500, 108 S. Ct. 2510 (1988), but did not decide it. See id. at 505 n.1, 108 S. Ct. at 2515 n.1. We have been presented with the argument on two prior occasions. Once, in a binding former Fifth Circuit case, we found that derivative Feres immunity could not apply because the private contractor was not a common law agent. Whitaker v. Harvell-Kilgore Corp., 418 F.2d 1010, 1015 (5th Cir. 1969); see generally Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (holding that decisions of the Fifth Circuit rendered before the close of business on September 30, 1981 are binding precedent in the Eleventh Circuit). In the other case, we found that the argument had not been squarely presented to the district court, and therefore declined to reach it. Shaw v. Grumman Aerospace Corp., 778 F.2d 736, 740 (11th Cir. 1985). The only other court to consider a claim of derivative Feres immunity appears to be the Ninth Circuit, which rejected the immunity claim in Chapman v. Westinghouse Electric Corp., 911 F.2d 267, 271 (9th Cir. 1990).

combatant activities exception, 28 U.S.C. § 2680(j), and the discretionary functions

exception, 28 U.S.C. § 2680(a).  The Supreme Court created another such

exception in Feres v. United States, 340 U.S. 135, 71 S. Ct. 153 (1950).

In Feres, the Supreme Court held that service members are barred from

bringing suit against the federal government for injuries that "arise out of or are in

the course of activity incident to [military] service."  Id. at 146, 71 S. Ct. at 159.

As a result of the Feres doctrine, soldiers may not recover for their service-related

injuries in tort suits against the government, even if the tort suit is not barred by an

explicit exception to the FTCA.[11]

The Feres doctrine has been controversial, even as applied to the

government.  See United States v. Johnson, 481 U.S. 681, 703, 107 S. Ct. 2063,

2075 (1987) (Scalia, J., dissenting, joined by Brennan, Marshall, & Stevens, JJ.)

(describing their perception of "the plain error" of Feres).  In Kitowski v. United

States, 931 F.2d 1526, 1529 (11th Cir. 1991), we noted that "there now appears to

---

[11] The meaning of "incident to service" has been a matter of much dispute.  But it is quite clear that it operates broadly to bar most tort claims that arise in the course of a soldier's duties, whether in peacetime or wartime, in combat or on a base.  See, e.g., Feres, 340 U.S. at 137, 71 S. Ct. at 155 (soldier perished due to fire in barracks located in New York; negligence action barred); Jimenez v. United States, 158 F.3d 1228, 1229 (11th Cir. 1998) (per curiam)  (Feres barred suit based on allegedly negligent hip surgery); Kitowski v. United States, 931 F.2d 1526, 1528 (11th Cir. 1991) (Feres barred suit by soldier killed when he was held under water during Navy hazing exercise).

be some support on the Supreme Court for overruling <u>Feres</u>."[12]

But, as applied to the government, <u>Feres</u> remains the law. The Supreme Court's latest formulation of the immunity is contained in <u>United States v. Johnson</u>, 481 U.S. 681, 107 S. Ct. 2063 (1987). There the Court held that the doctrine rests on three policies. In the first place, "the relationship between the Government and members of its armed forces is distinctively federal in character." <u>Johnson</u>, 481 U.S. at 689, 107 S. Ct. at 2068 (punctuation and citation omitted). The "distinctively federal" nature of this relationship means, according to the Court, that the government's liability to soldiers for service-related accidents must be governed by a uniform rule. <u>Id.</u>

Second, the Court held that the uniform rule concerning the government's liability for service-related injuries to soldiers must be one of no liability. The Court arrived at this conclusion by construing the statutory benefits the government provides to injured service members as a congressional cap on the government's

---

[12] This support for overruling <u>Feres</u> itself is all the more significant because of the Supreme Court's normally strong presumption of <u>stare decisis</u> in the area of statutory interpretation. <u>See</u> <u>IBP, Inc. v. Alvarez</u>, 546 U.S. 21, 32, 126 S. Ct. 514, 523 (2005) ("Considerations of <u>stare decisis</u> are particularly forceful in the area of statutory construction"). <u>Feres</u> was a statutory interpretation case, creating an implied exception to the FTCA. <u>See</u> <u>Feres</u>, 340 U.S. at 138, 71 S. Ct. at 155 (referring to "our task of statutory construction"). We of course do not deny that <u>Feres</u> remains the law; rather, the controversy surrounding the correctness of <u>Feres</u>, as applied to the government, is a factor to be considered when deciding whether to extend it to private contractors.

liability for soldiers' service-related injuries.  See Johnson, 481 U.S. at 690, 107 S.

Ct. at 2069 ("[T]he statutory veterans' benefits provide an upper limit of liability

for the Government as to service-connected injuries.") (punctuation and citation

omitted).  The uniformity policy dictates a uniform rule, and the cap policy justifies

a uniform rule of no liability.[13]  As a result, the government is not liable to soldiers

for torts that cause service-related accidents, apart from the compensation provided

by Congress in the form of statutory benefits.

As the third and final rationale supporting the Feres bar, the Court has

observed that service-related tort claims are often "the types of claims that, if

generally permitted, would involve the judiciary in sensitive military affairs at the

expense of military discipline and effectiveness."  Johnson, 481 U.S. at 690, 107 S.

Ct. at 2069 (punctuation and citation omitted).  This rationale was not part of the

original justification for Feres, and is found nowhere in the Feres opinion itself.  It

was added four years later, in United States v. Brown, 348 U.S. 110, 112, 75 S. Ct.

---

[13] As some have observed, the uniformity policy, by itself, might have led the Court to develop a federal common law of tort liability incident to service, rather than barring such suits altogether.  See Taber v. Maine, 67 F.3d 1029, 1040 (2d Cir. 1995) (Calabresi, J.) ("[I]f the impetus for Feres was the idea that all FTCA claims by military personnel should be controlled by a uniform federal law, then one would not have expected Feres to bar all such claims without discussion.  It would have been just as plausible for the Court to have begun developing a uniform federal common law of torts . . . that would be applied to military claims and that would subsequently be articulated on a case-by-case basis by the lower courts.") (emphasis in original).  The cap policy, however, explains why the uniform rule is one of "no liability"— because the statutory benefits are construed as supplying the uniform rule.

17

141, 143 (1954), and was acknowledged as one of the Feres policies in Johnson. The third rationale represents a kind of justiciability constraint. It recognizes that there are certain service-related tort claims that courts should not adjudicate because of the risk that litigation would interfere with military discipline or sensitive military judgments.

In sum, for these three reasons, Feres operates to bar all service-related tort claims brought by soldiers against the government. When a soldier incurs injuries incident to service, the United States is deemed not to have waived its sovereign immunity from suit. As a result, the soldier may not recover in a wide variety of tort suits against the government, ranging from suits based on combat activities, to suits based on training activities, to suits based on medical malpractice in a military hospital, to suits based on slips and falls attributable to the government's negligence on military bases in the United States during peacetime. We must decide, in the instant case, whether this broad-based immunity extends, in whole or in part, to private military contractors.

2. Derivative sovereign immunity

Presidential claims that it is entitled to claim the whole of the government's Feres immunity under the theory of derivative sovereign immunity. The doctrine

18

of derivative sovereign immunity had its origin in Yearsley v. W.A. Ross Construction Co., 309 U.S. 18, 60 S. Ct. 413 (1940). In this somewhat cryptic decision, the Supreme Court appeared to hold that a common law agent may sometimes share in the sovereign immunity of the United States, because "[t]he action of the agent is the act of the government." Id. at 22, 60 S. Ct. at 415 (punctuation and citation omitted). Since Yearsley, courts have recognized claims of derivative sovereign immunity in a variety of contexts. See, e.g., Butters v. Vance Int'l, Inc., 225 F.3d 462, 466 (4th Cir. 2000) (private contractor entitled to derivative sovereign immunity for following commands of foreign sovereign, Saudi Arabia); Myers v. United States, 323 F.2d 580, 583 (9th Cir. 1963); Papagianakis v. The Samos, 186 F.2d 257, 261-62 (4th Cir. 1950).

We have never upheld a claim of derivative sovereign immunity, although the theory has been presented to us on several occasions. We have, however, imposed a limitation on derivative sovereign immunity, if it in fact exists. In Whitaker v. Harvell-Kilgore Corp., 418 F.2d 1010 (5th Cir. 1969), we rejected a claim of derivative sovereign immunity on the ground that the entity claiming it was not a common law agent. Id. at 1015 ("Kilgore was clearly an independent contractor and is not entitled to sovereign immunity."). Because of Whitaker, to make out a claim of derivative sovereign immunity in this circuit, the entity

19

claiming the immunity must at a bare minimum have been a common law agent of the government at the time of the conduct underlying the lawsuit. See Shaw v. Grumman Aerospace Corp., 778 F.2d 736, 740 (11th Cir. 1985).

Presidential appears to acknowledge that status as a common law agent is necessary to a claim for derivative sovereign immunity. Presidential argues at length that it in fact was a common law agent at the time of the accident underlying this case.[14]

But Presidential acknowledges no other limitation on the extent of derivative sovereign immunity. Instead, Presidential argues that status as a common law agent is a sufficient condition for derivative sovereign immunity. According to Presidential, so long as the government has sovereign immunity with respect to the conduct underlying the suit, and so long as the private contractor is a common law agent of the government, the private contractor shares in the government's sovereign immunity. Presidential thus argues that, because the government likely would have Feres immunity from suit in this case (the soldiers were almost certainly injured "incident to service"), Presidential is derivatively entitled to that

---

[14] Although the balance of Part I.B of this opinion repeatedly refers to private contractor agents of the military, we expressly have not determined that Presidential has adduced sufficient evidence of control to establish agent status. In light of our disposition, we need not make that determination.

same immunity. The upshot of Presidential's argument is that common law agents of the government would, like the government, have complete immunity from suits brought by soldiers for service-related injuries.

We think that the premise of Presidential's position is quite clearly wrong. Status as a common law agent is not a sufficient condition for derivative sovereign immunity. If it were, then the law of federal officer immunity would be different in certain respects. A federal officer is simply a specialized common law agent, a servant or employee. If Presidential's theory were true then, because the United States is immune from suit by default (absent its consent), see Hercules, Inc. v United States, 516 U.S. 417, 422, 116 S. Ct. 981, 985 (1996), federal officers would share in the government's sovereign immunity whenever it has not been waived.

But it is simply not the case that federal officers share in the sovereign's immunity whenever it has not been waived. Federal officers receive immunity in many situations. But unlike the immunity possessed by the government, that immunity must be affirmatively justified, and does not flow automatically from the government's retained sovereign immunity. See Westfall v. Erwin, 484 U.S. 292, 295, 108 S. Ct. 580, 583 (1988) ("[A]bsolute immunity for federal officials is justified only when 'the contributions of immunity to effective government in

21

particular contexts outweigh the perhaps recurring harm to individual citizens.'") (quoting Doe v. McMillan, 412 U.S. 306, 320, 93 S. Ct. 2018, 2028 (1973)); Anderson v. Creighton, 483 U.S. 635, 638, 107 S. Ct. 3034, 3038 (1987) (qualified immunity for federal officers in Bivens actions justified by need to balance benefit of deterring constitutional violations against "risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties"). In general, the Court has emphasized that a federal officer's immunity is justified only insofar as it is necessary to protect the officer's performance of a governmental function. See Westfall, 484 U.S. at 296 n.3, 108 S. Ct. at 583 n.3 ("In determining the propriety of shielding an official from suit under the circumstances, this Court has long favored a 'functional' inquiry — immunity attaches to particular official functions, not to particular offices. . . . The adoption of this functional approach reflects the Court's concern . . . that federal officials be granted absolute immunity only insofar as the benefits of immunity outweigh the costs.").

Because the government has immunity by default while an officer's immunity must be affirmatively justified, there are, unsurprisingly, cases where the government is immune but the federal officer is not. An example from current law demonstrates that official immunity and sovereign immunity are not coextensive.

22

Federal officers generally receive only qualified immunity in a <u>Bivens</u> action. <u>See</u> <u>Anderson</u>, 483 U.S. at 638, 107 S. Ct. at 3038 (noting that "[o]ur cases . . . generally provid[e] government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated"). This means that federal officers are not immune if they violate clearly established constitutional rights and are sued under <u>Bivens</u>. The government itself, on the other hand, remains immune, even if the right allegedly violated by the officer is clearly established. <u>See</u> <u>Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics</u>, 403 U.S. 388, 410, 91 S. Ct. 1999, 2012 (1971) (Harlan, J., concurring in the judgment) ("However desirable a direct remedy against the Government might be as a substitute for individual official liability, the sovereign still remains immune to suit."); <u>FDIC v. Meyer</u>, 510 U.S. 471, 485, 114 S. Ct. 996, 1005 (1994) ("[W]e implied a cause of action against federal officials in <u>Bivens</u> in part <u>because</u> a direct action against the Government was not available.") (emphasis in original); <u>Boda v. United States</u>, 698 F.2d 1174, 1176 (11th Cir. 1983) (claim against United States for damages for violation of constitutional rights "barred by the doctrine of sovereign immunity"). As a result,

23

the government may be immune from liability for damages for violating a person's constitutional rights, even though the officer-agent is not.[15]

If Presidential's position were correct, then this result would not be possible, because the federal officer, as a special kind of common law agent, would be derivatively entitled to the same immunity the government possesses. Presidential's premise of total derivative immunity for common law agents therefore cannot be correct.

Moreover, it is clear that if a federal officer cannot claim complete derivative immunity, neither can a mere common law agent. The result urged by Presidential would mean that, in a <u>Bivens</u> suit, a prison guard <u>employed</u> by the government would have only qualified immunity, while a private contractor who works in the prison but is no more than a common law agent would have absolute immunity (assuming the government has not waived it). That result cannot possibly be the law.

_____

[15] The Court's decision in <u>Westfall v. Erwin</u>, 484 U.S. 292, 108 S. Ct. 580 (1988) is to the same effect. There the Court held that a federal officer is absolutely immune from state law tort suits only if performing a discretionary function in the scope of his or her employment, and not if performing a ministerial function in the scope of his or her employment. <u>See</u> <u>id.</u> at 297, 108 S. Ct. at 584. This meant that (a) an exception to the FTCA might apply (say, the intentional torts exception), (b) the government would be immune, but (c) the officer-agent would not be immune, unless the function was discretionary. While the <u>Westfall</u> result was subsequently modified by statute, <u>see</u> 28 U.S.C. § 2679(b)(1), the <u>Westfall</u> case shows that the immunity of the government and the immunity of federal officers are not necessarily coextensive.

Instead, it must be that, just as in the area of official immunity, the immunity of a common law agent must be affirmatively justified. Just as with a federal officer, the immunity of a private party, even if a common law agent, must be carefully tailored to protect the governmental functions the private party is exercising. Predictably, courts have been just as vigilant about tailoring the immunity of a private party to its perceived justification as they have been in tailoring the immunity of federal officers. See, e.g., Mangold v. Analytic Servs., Inc., 77 F.3d 1442, 1447 (4th Cir. 1996) (emphasizing that private contractors are entitled to immunity only "in the narrow circumstances where the public interest in efficient government outweighs the costs of granting such immunity"); Austin Mun. Securities, Inc. v. NASD, 757 F.2d 676, 687 (5th Cir. 1985) (holding that private companies charged with regulatory duties under Exchange Act are only entitled to immunity "to the extent necessary to permit the proper functioning of the regulatory system"). We must exercise the same vigilance in the instant case.

It is thus not enough for Presidential to point to its (alleged) status as a common law agent and the government's (alleged) Feres immunity. For Presidential to show that it is entitled to the government's Feres immunity, it must also show that the policies underlying the Feres bar extend to private contractor agents. This conclusion is not contrary to any derivative sovereign immunity case.

None of these cases say that status as a common law agent is a sufficient condition for the agent to have the government's immunity, only that it is a necessary condition. See, e.g., Whitaker, 418 F.2d at 1015.[16] Nor could status as a common law agent be a sufficient condition; otherwise, as discussed above, aspects of the law of official immunity would make little sense. We therefore turn to the policies underlying the Feres doctrine, and examine whether they justify immunity for private contractor agents from all service-related suits brought by soldiers.

3. Application of Feres rationales to private contractor agents

To determine whether Presidential, a private contractor, is derivatively entitled to the government's Feres immunity, we must decide whether and how the

_____

[16] It is true that in Shaw we opined in dicta about the scope of derivative Feres immunity, saying, "To evaluate a Yearsley claim in the military contractor context, a court would appear to be obliged to take three steps. First, it would apply the Feres doctrine to determine whether the government itself could be sued in that situation. If not, the court would then invoke a second body of doctrine, the law of principal and agent, to inquire whether the contractor actually acted as an agent of the government. Precedent in this Court makes it clear that . . . a firm must be more than simply an independent contractor to be regarded as the government's agent . . . . Finally, if the contractor proved agency status, the court would inquire whether the agent acted within the course and scope of its duties." Shaw, 778 F.2d at 740. But we nowhere said that status as an agent would be sufficient to entitle a private contractor the full scope of Feres immunity; rather, the best reading of the dicta is that we were setting out the minimum requirements for a hypothetical derivative Feres immunity. To the extent we may have implied that those were the only requirements, we are of course not bound by what was expressly dicta, and we now hold that a common law agent is not necessarily entitled to the full scope of the government's Feres immunity. As discussed above, such a result would be contrary to precedent and common sense.

26

policies underlying Feres apply to private contractor agents. The first Feres policy

is ensuring that the government faces a uniform rule with respect to injuries

incurred by soldiers incident to service. See Johnson, 481 U.S. at 689, 107 S. Ct. at

2068. The Court adopted in Feres a uniform rule of no liability in service-related

tort suits brought by soldiers (apart from the statutory benefits provided by the

government). See id.

While the uniformity rationale does continue to apply to the government, it

does not apply at all to private contractors. To apply the rationale to private

military contractors would be highly anomalous. Government agencies in general

(apart from the military) do not have the benefit of a Feres bar, and therefore must

face the non-uniform tort law of the various states (so long as an explicit FTCA

exception does not apply). See 28 U.S.C. § 1346(b). For example, the federal

prison system must contend with non-uniform tort law. See United States v.

Muniz, 374 U.S. 150, 162, 83 S. Ct. 1850, 1857 (1963). In Muniz, the Supreme

Court expressly refused to extend the Feres uniformity rationale to the federal

prison system. See id. ("Without more definite indication of the risks of harm from

diversity, we conclude that the prison system will not be disrupted by the

application of Connecticut law in one case and Indiana law in another . . . .").

Private contractor agents have no more pressing need for a uniform rule. If

anything, they have far less exposure than a gigantic federal agency that would face non-uniform rules on a daily basis, and therefore much less risk of having to contend with varying law.[17] The first Feres rationale therefore does not apply to a private contractor such as Presidential.

The second policy underlying the Feres bar is the cap on the government's liability for service-related injuries, set at the amount of statutory benefits provided to the service member. Johnson, 481 U.S. at 690, 107 S. Ct. at 2068. The government's liability is capped because it has compensated the soldier to some degree (by way of the statutory remedy). The Court has therefore implied that these benefits are all that Congress intended for the government to provide the soldier. See id.

The cap policy also does not apply to the private contractor. The private contractor, unlike the government, has not had to pay anything to the soldier, and will not have to pay anything apart from what the soldier might recover in a tort suit. Nor is there any warrant to read the cap on the government's liability as an implied cap on the private contractor's. There is absolutely no indication that

---

[17] We also note that private companies in general must face the varying tort law of the fifty states (so long as they have sufficient contact with the state to justify personal jurisdiction under due process principles). Presidential has not provided any reason why it is in a different position from any other private corporation, or should receive special treatment.

Congress, in providing statutory benefits for soldiers, intended them to substitute in any way for a remedy against private contractor agents of the military, or intended them to cap the liability of private contractors to soldiers they injure in the course of duty. We therefore decline to recognize the cap policy as a justification for applying the Feres bar to private contractors.[18]

It is not surprising that the first two Feres policies apply only to the government, because they serve to protect distinctively <u>sovereign</u> interests — ensuring that the government is not crippled by a non-uniform standard for soldiers' injuries incurred incident to service, and ensuring that the government's liability is capped at the amount of statutory benefits it provides to injured soldiers. The Supreme Court has itself implicitly recognized that these two Feres policies do

_____

[18] Another reason for finding that the cap policy does not apply to a private contractor flows from the best explanation of the cap policy — that it roughly approximates the state worker's compensation system for the military. Judge Calabresi put forth this explanation of the cap policy in <u>Taber v. Maine</u>, 67 F.3d 1029 (2d Cir. 1995). The worker's compensation remedy in most states is the exclusive remedy for a worker against his employer for torts committed by the employer in the course of employment. The Feres bar can be seen as providing the same exclusivity where a soldier was injured in the course of his employment; the statutory remedy serves as the worker's compensation award, and the "incident to service" test approximates the "in the course of employment" test under worker's compensation law. See <u>Taber</u>, 67 F.3d at 1050. This explains in part why the soldier can sue the government for torts it commits against him that are not "incident to service," but is precluded from suing when the tort is "incident to service." See <u>id.</u>

But this policy of approximating worker's compensation clearly does not apply to the private contractor. The soldier is not the employee of the private contractor, and therefore should not be required to have exclusive resort to a remedy that approximates worker's compensation. This is another reason why the second Feres policy cannot apply to a private contractor.

not apply to individuals, such as private contractors.  The Supreme Court has twice

relied on the Feres policies, in another context, to refuse to create a Bivens cause of

action against federal employees for service-related constitutional torts.  On both

occasions, it did not rely on the first two Feres rationales.  See Chappell v. Wallace,

462 U.S. 296, 299, 103 S. Ct. 2362, 2365 (1983) (in a case refusing to imply

Bivens action against superior officer where the soldier was injured incident to

service, relied only on discipline rationale of Feres, not cap or uniformity); United

States v. Stanley, 483 U.S. 669, 678-83, 107 S. Ct. 3054, 3061-63 (1987) (also

relying, post-Johnson, on only the third rationale of Feres in refusing to create

Bivens action against government employee where serviceman's injury was

incident to service).  Rather, the Court relied solely on the third Feres rationale —

preventing interference with military discipline and military judgments.  The Court

eschewed reliance on the first two Feres rationales even though the defendant in

each case was a government employee — a special kind of common law agent.  We

therefore do not hesitate to find that these two policies do not apply to private

contractors, even if they are agents of the military.

On the other hand, we do believe that the third Feres policy potentially has

some application to private contractor agents of the military.  The third justification

for the Feres bar is that it protects against interference with military discipline and

30

sensitive military judgments. Johnson, 481 U.S. at 690, 107 S. Ct. at 2069. We have previously recognized that this rationale embodies two "distinct" concerns: "(1) whether the suit requires the court to second-guess military decisions, and (2) whether the suit might impair essential military discipline." Shaw, 778 F.2d at 742 (punctuation and citation omitted). We described the military judgments strand as "the classic separation of powers theory." Id. The "essential military discipline" strand, on the other hand, prevents disruption of the relationship between the service member and his military superiors and cohorts. Id.

The discipline strand of the third Feres rationale does not have application in the context of private contractors. In Shaw, we noted that the "essential military discipline" rationale itself embodies two concerns: "(1) the notion that a soldier might use the civilian courts to challenge the act or order of a superior officer; and (2) the idea that in a civilian suit of any sort involving a serviceman, members of the military might be compelled to testify against one another." Id. at 742. We concluded that neither concern would justify protection of the military contractor. In the first place, the concern that a soldier might use a suit to challenge a superior officer is absent because a private contractor is not in the chain of command. Id. at 742-43. That observation is equally true where the private contractor happens to be an agent of the government. Because the private contractor agent is not in the

31

chain of command, a soldier cannot use a suit against the contractor to "challenge

the act or order of a superior officer." Id. at 742.

In the second place, we concluded in Shaw that any risk to discipline from

the process of trying a case against a private contractor was too remote to be

accorded significant weight. Although we acknowledged that soldiers might have

to testify on opposite sides in a suit against a private contractor, we stated that "the

likelihood of any profound disruption of discipline is negligible from testimony in

suits against military contractors." Shaw, 778 F.2d at 743. We recognize that here

too, in a suit against a private contractor agent, there may be soldiers testifying on

opposite sides. But we agree with the Shaw Court that this does not present a

significant threat to military discipline.[19]

Our conclusion that the discipline policy does not have significant

application to private contractor agents is fortified by the opinion of the four

_____

[19] We recognize that this discussion of the Feres "essential discipline" rationale in Shaw
was part of our discussion of the military contractor defense. Our conception of that defense was
later overturned in Boyle. See Boyle, 487 U.S. at 513, 108 S. Ct. at 2519. But in this part of the
Shaw opinion, we were merely discussing the discipline strand of Feres before rejecting it as a
ground for our military contractor defense. Boyle did nothing to undermine this reading of that
Feres policy and our subsequent rejection of that policy as it applied to private contractors. In
fact, the Supreme Court went further, and rejected the entirety of Feres as a ground for the
military contractor defense. See Boyle, 487 U.S. at 510, 108 S. Ct. at 2517. Thus Boyle did
nothing to undermine Shaw's reading of this particular Feres policy and was, if anything,
consistent with Shaw on that point. We believe the analysis is still correct, and has not been
undermined by anything since.

32

dissenters in <u>Johnson</u>, who set out several reasons why the discipline policy does not even apply strongly to the government itself.  Justice Scalia said,

> It is strange that Congress' "obvious" intention to preclude <u>Feres</u> suits because of their effect on military discipline was discerned neither by the <u>Feres</u> Court nor by the Congress that enacted the FTCA (which felt it necessary expressly to exclude recovery for combat injuries).  Perhaps Congress recognized that the likely effect of <u>Feres</u> suits upon military discipline is not as clear as we have assumed, **but in fact has long been disputed**. . . . Or perhaps Congress assumed that the FTCA's explicit exclusions would bar those suits most threatening to military discipline, such as claims based upon combat command decisions, 28 U.S.C. § 2680(j); claims based upon performance of "discretionary" functions, § 2680(a); claims arising in foreign countries, § 2680(k); intentional torts, § 2680(h); and claims based upon the execution of a statute or regulation, § 2680(a). . . . Or perhaps — most fascinating of all to contemplate — Congress thought that barring recovery by servicemen might adversely affect military discipline.  After all, the morale of Lieutenant Commander Johnson's comrades-in-arms will not likely be boosted by news that his widow and children will receive only a fraction of the amount they might have recovered had he been piloting a commercial helicopter at the time of his death.

<u>Johnson</u>, 481 U.S. at 699-700, 107 S. Ct. at 2073-74 (Scalia, J., dissenting, joined by three others) (emphasis added).  We of course may not deny that the discipline rationale continues to apply to the government, even if the reasoning in the <u>Johnson</u> dissent has some force; the <u>Johnson</u> majority held that it still does.  But we are perfectly free to hold that, given the arguably tenuous application of the discipline rationale to the government itself, there is no warrant to extend it to private

33

contractors, a context in which its application is clearly even more tenuous. We are confident in our judgment that there is no substantial impact on military discipline from soldiers recovering for the torts of private contractors, and are free to draw that conclusion because neither this Court nor the Supreme Court has held that it does extend to private contractors. Indeed, in Shaw, we held the opposite.

While we do not accept that the discipline portion of the third Feres rationale applies to private contractors, we do recognize that the other part — the risk of a tort suit interfering with sensitive military judgments — does potentially apply to private contractor agents. As the Court in Johnson recognized, suits involving accidents that occurred incident to service may "implicate[] the military judgments and decisions that are inextricably intertwined with the conduct of the military mission." Johnson, 481 U.S. at 691, 107 S. Ct. at 2069. Applying a tort law standard of care to sensitive military judgments is problematic for two reasons, both of which potentially apply to private contractor agents entrusted with executing or making such judgments.

In the first place, there is a problem of institutional competence. Where sensitive military judgments are involved, courts lack the capacity to determine the proper tradeoff between military effectiveness and the risk of harm to the soldiers. For example, it is not possible for a court to develop a standard of care for a

34

reasonably safe infantry assault on a fortified enemy outpost.  See Chappell, 462

U.S. at 302, 103 S. Ct. at 2366 ("The complex, subtle, and professional decisions as

to the composition, training, equipping, and control of a military force are

essentially professional military judgments . . . .") (quoting Gilligan v. Morgan, 413

U.S. 1, 10, 93 S. Ct. 2440, 2446 (1973)); Aktepe v. United States, 105 F.3d 1400,

1404 (11th Cir. 1997) ("[C]ourts lack standards with which to assess whether

reasonable care was taken to achieve military objectives while minimizing injury

and loss of life."); Tiffany v. United States, 931 F.2d 271, 279 (4th Cir. 1991)

(noting that courts cannot develop standards for a prudent intercept).  Rather than

develop such standards where they lack the expertise, courts instead trust that the

military is in the best position to determine the appropriate tradeoff between safety

and combat effectiveness.

When a private contractor agent is entrusted with making or executing such

sensitive military judgments, courts would be similarly powerless to determine

whether the agent appropriately balanced military effectiveness and the safety of

the soldiers.  See Boyle, 487 U.S. at 511, 108 S. Ct. at 2518 (offering as one reason

for the military contractor defense the fact that determining liability would involve

"the balancing of many technical, military, and even social considerations,

including specifically the trade-off between greater safety and greater combat

35

effectiveness"). The court would therefore be equally incapable of entertaining the tort suit.

Second, even if courts could determine what a "reasonable bombing" or a "reasonable intercept" would be, it would violate the separation of powers for courts to second-guess the military's decision in a tort suit. These sorts of sensitive military judgments have been constitutionally committed to the political branches. See Stanley, 483 U.S. at 682, 107 S. Ct. at 3063 (emphasizing "the insistence (evident from the number of Clauses devoted to the subject) with which the Constitution confers authority over the Army, Navy, and militia upon the political branches"); Aktepe, 105 F.3d at 1404 (noting that it "would express a lack of respect for the political branches of government by subjecting their discretionary military and foreign policy decisions to judicial scrutiny, notwithstanding the judiciary's relative lack of expertise in these areas"). Even if courts were competent to develop liability standards in the area of sensitive military judgments, it would breach separation of powers to apply those standards to the military.

It would similarly violate separation of powers for the courts to interfere with sensitive military judgments made or executed by private contractor agents of the military. The military has the constitutionally exclusive authority to make those kinds of judgments, and judicial oversight of the private contractor agents the

36

military uses to execute those judgments would likewise violate separation of powers principles.

This sensitive-military-judgments strand of the third Feres rationale embodies concerns about justiciability and separation of powers. It is thus related to the political question doctrine, which is a constitutional restraint on the jurisdiction of the federal courts. See Baker v. Carr, 369 U.S. 186, 217, 82 S. Ct. 691, 710 (1962) (stating that factors justifying abstention under political question doctrine include "a lack of judicially discoverable and manageable standards" and "a textually demonstrable constitutional commitment of the issue to a coordinate political department"). Demonstrating this close connection, when the Court has discussed the military judgments portion of the third Feres rationale, it has often mixed in reference to political question cases. See United States v. Shearer, 473 U.S. 52, 58, 105 S. Ct. 3039, 3043 (1985) (citing Gilligan v. Morgan, 413 U.S. 1, 93 S. Ct. 2440 (1973)); Chappell, 462 U.S. at 301, 103 S. Ct. at 2366 (citing Gilligan). Our political question cases have, in turn, cited the third Feres rationale when discussing this concern about interfering with military judgments. See Aktepe, 105 F.3d at 1403 (citing Chappell and Stanley). It is evident that the military judgments strand in Feres and the military judgments strand under the political question doctrine overlap and reinforce each other.

4. Some form of immunity may be appropriate for private contractor agents

We thus acknowledge that private contractor agents may be entitled to some form of immunity that protects their making or executing sensitive military judgments, and that overlaps and possibly extends beyond the protection provided by the political question doctrine. The question then becomes whether the Feres "incident to service" test is the proper way to protect private contractor agents performing such functions.

a. Incident-to-service test

We think it quite clear that the incident-to-service test sweeps far too broadly to protect this concern. Some suits barred by the incident-to-service test simply do not involve sensitive military judgments that courts lack the competence or authority to deal with. For example, where a private contractor agent is running a mess hall on a peacetime base, and a soldier gets food poisoning attributable to the contractor's negligence, the suit would be barred under the "incident to service" test. But in such a suit, there is no concern about interfering with sensitive military judgments. Courts do not lack well-developed standards for dealing with "negligent food service." Nor does it offend separation of powers for a court to say that a private contractor agent must pay for its negligence in serving tainted food to

soldiers. Because "incident to service" necessarily includes a large number of these non-sensitive military judgments, it is far too broad to protect contractors from suits that might interfere with sensitive military judgments.

Proof that some suits "incident to service" do not offend separation of powers or present justiciability problems is easily found in the fact that civilians are not barred from bringing some such suits against the government, even though a soldier would be. It is well-established that Feres applies only to soldiers, and therefore does not bar civilian suits along some portion (probably a large portion) of the incident-to-service spectrum. See, e.g., Boyle, 487 U.S. at 510-11, 108 S. Ct. at 2517-18 (Feres "covers only service-related injuries, and not injuries caused by the military to civilians," and as a result, "it could not be invoked to prevent, for example, a civilian's suit against the manufacturer of fighter planes, based on a state tort theory, claiming harm from what is alleged to be needlessly high levels of noise produced by the jet engines"); Taber, 67 F.3d at 1047 ("Feres does not bar suits against the government when the injured plaintiff is a civilian. This remains the case even though the injurer is in the military and military discipline is directly involved.") (emphasis in original). Civilians are barred from bringing suit against the government only to the extent the government has not waived its sovereign immunity — for example, where the combatant activities exception applies. As a

39

result, a large number of suits on the "incident to service" spectrum can be brought by civilians.

This means that some number of "incident to service" suits must not inherently offend separation of powers or present problems of justiciability. If they did, civilians too would be barred from suing the government. But, as Judge Calabresi has observed, "[I]n any number of civilian cases, the alleged judicial inquiry into (and interference with) military affairs, occurs anyway. And if this interference occurs regularly in any event, it cannot possibly raise the constitutional concerns that warrant tortured statutory construction and judicial abstention." Taber, 67 F.3d at 1047. The fact that civilians are not barred from suing the government along some part of the incident-to-service spectrum indicates that those suits are not inherently non-justiciable, and do not involve sensitive military judgments that are outside judicial competence.

The government, of course, does receive immunity in service-related suits brought by soldiers, even when they do not implicate sensitive military judgments. For example, the soldier may not sue the government in the mess hall hypothetical discussed above, if it is the government that is operating the mess hall. But that is because the government's Feres immunity is supported by policies other than protecting sensitive military judgments: namely, the uniformity, cap, and discipline

40

policies.  First, the government needs a uniform rule, even where sensitive military judgments are not implicated.  Second, the soldier's statutory benefit represents the cap on the government's liability.  And third, the suit may impair discipline because it would pit the soldier against his employer and may involve conflict with his superior officer or another soldier.

As discussed above, these rationales do not apply to a private contractor. Immunity for private contractors is justified only by the need to protect the making and execution of sensitive military judgments.  And, as demonstrated above, a number of "incident to service" suits — probably a substantial number — do not implicate sensitive military judgments, because they can be brought by civilians.[20] As a result, the derivative Feres immunity of private contractors cannot possibly extend to the outer limits of "incident to service."  We therefore hold that private contractors, even if they are agents, are not entitled to immunity from all

---

[20] Indeed, the four dissenters in Johnson criticized Feres itself for this very reason.  See Johnson, 481 U.S. at 700, 107 S. Ct. at 2074 (Scalia, J., dissenting) ("To the extent that reading the FTCA as it is written will require civilian courts to examine military decisionmaking and thus influence military discipline, it is outlandish to consider that result 'outlandish' . . . since in fact it occurs frequently, even under the Feres dispensation.  If Johnson's helicopter had crashed into a civilian's home, the homeowner could have brought an FTCA suit that would have invaded the sanctity of military decisionmaking no less than respondents'.  If a soldier is injured not 'incident to service,' he can sue his Government regardless of whether the alleged negligence was military negligence.") (emphasis in original).  Along similar lines, we hold that the "incident to service" test is an inappropriate way to protect against interference with sensitive military judgments involving private contractor agents, because it sweeps far too broadly.

41

service-related suits brought by soldiers.

b. Feres as a basis for private contractor immunity where sensitive military judgments may be involved

As demonstrated above, private contractors are, at most, entitled to a more constricted form of derivative Feres immunity. The Feres "incident to service" test is too broad for the purpose of protecting private contractor agents performing sensitive military functions. But a narrower formulation might conceivably be appropriate for the purpose of protecting this kind of military judgment.

It might be said that the political question doctrine, with its explicit concerns regarding justiciability and separation of powers, exhausts the category of military judgments insulated from judicial review. We are, however, willing to entertain the possibility that the political question doctrine, while it informs this strand of Feres, does not necessarily exhaust the category of sensitive military functions that should be protected from judicial scrutiny. We might, for example, accord derivative Feres immunity to a private contractor agent across some spectrum narrower than "incident to service" but possibly broader than political question. This might conceivably include suits involving quintessential or peculiarly military judgments that courts should not hear as a matter of prudence, rather than a matter of

constitutional law.

Even if such an immunity is warranted, however, we do not believe that the Feres doctrine is an appropriate ground upon which to build it. The reason is that an immunity built on Feres would only prevent soldiers — and would not prevent civilians — from bringing suit against private military contractors making or executing sensitive military judgments. The immunity would necessarily operate in this way because derivative immunity can be no broader than the sovereign immunity that grounds it, and the government's Feres immunity only extends to suits brought by soldiers. See, e.g., Boyle, 487 U.S. at 510, 108 S. Ct. at 2517-18 (Feres "covers only service-related injuries, and not injuries caused by the military to civilians"). Feres immunity bars only soldiers — not civilians — even where the civilian suit would require the court to examine a potentially sensitive military judgment. Compare Shearer, 473 U.S. at 58, 105 S. Ct. at 3043 (Feres barred suit by soldier against government for negligent supervision of tortfeasor) with Sheridan v. United States, 487 U.S. 392, 402-03, 108 S. Ct. 2449, 2456 (1988) (Feres did not bar suit by civilian against government for negligent supervision of tortfeasor); see also Taber, 67 F.3d at 1047 ("Feres does not bar suits against the government when the injured plaintiff is a civilian. This remains the case even though the injurer is in the military and military discipline is directly involved.")

(emphasis in original). Because derivative sovereign immunity cannot be broader than the sovereign immunity that grounds it, this means that a hypothetical sensitive military judgments immunity grounded on Feres could only prevent soldiers from bringing suit.

This consequence means that derivative Feres immunity is an inappropriate vehicle for a "sensitive military judgments" immunity for private contractor agents. In the first place, it would not be effective to protect sensitive military judgments from judicial review because it would not bar suits brought by civilians that implicate such judgments. As an example, any such immunity, as applied to the plane crash in the instant case, would not apply to civilians on board the plane. The employees of Presidential itself (three of whom perished in the accident) could sue Presidential for Presidential's negligence. Those suits would not be barred by the hypothetical derivative Feres immunity tailored to protect sensitive military judgments. Yet they would present the very same threat of subjecting sensitive military judgments to second-guessing by a court.

On top of the ineffectiveness of an immunity grounded on Feres, it would also be inequitable because it would single out soldiers for special disfavor in the courts of law. As noted above, Feres applies only to soldiers, so derivative Feres immunity, even if restricted to sensitive military judgments, could apply only to

44

soldiers as well. But that would have consequences that belie common sense. For example, assume the hypothetical situation of a sensitive military function being performed by a private contractor agent that does not fall within the category of cases barred by the political question doctrine.[21] Assume also three people injured by the contractor's performance of the sensitive military function: a soldier, a civilian employee of the private contractor, and a journalist. If we extended Feres derivatively to the private contractor, the soldier could not sue the contractor. The employee of the private contractor could sue because, by hypothesis, the suit would not be barred by the political question doctrine. And so could the journalist, for the same reason. There is simply no principled reason why this result should obtain. We refuse to single out soldiers who sacrifice their lives and limbs for our country for special disfavor, even for the laudatory purpose of protecting sensitive military judgments from judicial interference.

As a result, we must hold that derivative Feres immunity does not exist in this case. Three of the four recognized Feres rationales do not apply to private contractors. And while protecting sensitive military judgments could conceivably ground an immunity, Feres is an inappropriate vehicle because it would single out

_____

[21] Of course, such cases must exist if the immunity is to have independent force. If the political question doctrine exhausted the category of sensitive military judgments, this hypothetical immunity would not even be necessary.

45

soldiers and would not protect sensitive military judgments in suits brought by anyone else (including journalists or private contractor employees).

This is not the first time that Feres has been found to be an inappropriate ground upon which to build a protection for private contractors who are involved with sensitive military judgments. In Boyle v. United Technologies Corp., 487 U.S. 500, 108 S. Ct. 2510 (1988), the Court held that military contractors have an affirmative defense in a products liability suit where "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." Boyle, 487 U.S. at 512, 108 S. Ct. at 2518. But the Court refused to ground this so-called military contractor defense on Feres, for the following reasons:

> [I]t seems to us that the Feres doctrine, in its application to the present problem, logically produces results that are in some respects too broad and in some respects too narrow. Too broad, because if the Government contractor defense is to prohibit suit against the manufacturer whenever Feres would prevent suit against the Government, then even injuries caused to military personnel by a helicopter purchased from stock . . . would be covered. Since Feres prohibits all service-related tort claims against the Government, a contractor defense that rests upon it should prohibit all service-related tort claims against the manufacturer — making inexplicable the three limiting criteria for contractor immunity . . . . On the other hand,

46

reliance on <u>Feres</u> produces (or logically should produce) results that are in another respect too narrow. Since that doctrine covers only service-related injuries, and not injuries caused by the military to civilians, it could not be invoked to prevent, for example, a civilian's suit against the manufacturer of fighter planes, based on a state tort theory claiming harm from what is alleged to be needlessly high levels of noise produced by the jet engines. Yet we think that the character of the jet engines the Government orders for its fighter planes cannot be regulated by state tort law, no more in suits by civilians than in suits by members of the Armed Services.

<u>Boyle</u>, 487 U.S. at 510-11, 108 S. Ct. at 2517-18.

The reasons why the Supreme Court rejected <u>Feres</u> as a basis for the military contractor defense in <u>Boyle</u> are essentially the same reasons why we refuse to ground the hypothesized "sensitive military judgment" immunity on <u>Feres</u> today. The Court in <u>Boyle</u> recognized that reliance on <u>Feres</u> would produce results that are too broad, because the "incident to service" test would include suits against contractors that did not implicate the policies the Court was concerned about in <u>Boyle</u>. Similarly, in this case, an immunity built on <u>Feres</u> would be too broad, because "incident to service" would cover tort suits that do not implicate sensitive military judgments. Then in <u>Boyle</u>, the Court held that a defense grounded on <u>Feres</u> would be too narrow because, even where the policies the Court was concerned about were present, civilians could still bring suit, thus vitiating the purpose of the immunity. Here too, an immunity built on <u>Feres</u> would be too

47

narrow because it would only protect against suits implicating sensitive military judgments that are brought by soldiers, and not against those brought by civilians, or even employees of the private contractor itself.

We emphasize that we do not mean to foreclose the possibility of an immunity that is broader than political question but narrower than "incident to service." We simply hold that any such immunity must, if it is to have any basis in reason, apply to civilians as well as soldiers: including the employees of private contractors, and other civilians. On the other hand, we readily acknowledge that this form of immunity may not exist if the political question doctrine is enough to protect private contractor agents performing sensitive military functions.

But we decline in the instant case to reach out and (a) decide whether such an immunity exists, or (b) assuming it exists, define the scope of such immunity.[22]

---

[22] We are not at all sure (especially given the complete lack of briefing) that an immunity extending beyond the political question doctrine would be recognized. Political question is a broad doctrine that can be flexibly applied to protect sensitive military judgments and areas where courts lack the competence to apply standards of care. The United States is always capable of intervening where its interests are at stake in a suit against a private contractor, and we might find such intervention persuasive where a contractor advances a political question argument.

We also note that our resolution of this issue is consistent with the extant cases. No federal court, district or appellate, has accorded derivative Feres immunity to a private contractor agent. On the other hand, several courts have used the political question doctrine to protect sensitive military judgments from being subjected to judicial scrutiny in suits that were brought against private contractors. See, e.g., Fisher v. Halliburton, Inc., 454 F. Supp. 2d 637, 644-45 (S.D. Tex. 2006); Whitaker v. Kellogg Brown & Root, Inc., 444 F. Supp. 2d 1277, 1281-82 (M.D. Ga. 2006).

At every stage of this litigation, Presidential has relied exclusively on derivative Feres immunity.  We do not ordinarily entertain arguments when they were not presented to the district court.  See Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1331 (11th Cir. 2004).  We certainly do not reach out to make an argument for a party that the party did not advance in the district court or in this Court, especially when that party expressly placed all of its reliance on another argument.  We took a similar approach in Shaw, where we reserved judgment on the derivative Feres immunity issue we now decide, even though it was potentially applicable, because it was not presented to the court below.  See Shaw, 778 F.2d at 740 ("The agency/sovereign immunity theory was neither presented fully to nor ruled on by the court below.").

Moreover, not only has Presidential relied exclusively on Feres derivative immunity, it has relied exclusively on the broadest form of that immunity.  Presidential did not even propose the limited version of derivative Feres immunity we hypothesized (and rejected) above — i.e., the kind that theoretically protects only sensitive military functions.  Instead, Presidential has argued during this entire litigation exclusively for the broad, "incident to service" form of derivative Feres immunity.  Such a broad immunity is triply flawed: it does not further the only Feres rationale that applies to a private contractor; it is ineffective because it only

49

applies to soldiers; and it is inequitable because it singles out soldiers who give their bodies and lives for their country for special disfavor.[23]  Given that Presidential consciously relied exclusively on Feres (and the broadest form of it at that), we will hold Presidential to its choice, and refuse to develop a hypothetical alternative kind of immunity out of whole cloth.

We thus expressly do not decide whether there is a "sensitive military function" immunity that protects a private contractor agent, and that exceeds the bounds of the political question doctrine.  We decide only that derivative Feres immunity is an inappropriate vehicle for such an immunity (if it in fact exists).  To recognize a derivative Feres immunity for private military contractors would provide a protection which is both too broad and too narrow in light of the justification therefor; and to do so would be in significant tension with the Supreme Court's Boyle decision.  Because derivative Feres is the only kind of immunity that has been argued to us, we will not reach out to address the question of what other immunity might be available for private contractor agents.[24]  We therefore turn to

---

[23] Of course, the potential benefits to Presidential (if it had succeeded on the "incident to service" argument) are equally clear.  An immunity defined only by "incident to service" would have given Presidential immunity from almost all tort suits that would arise out of its military contractor business, even those that do not involve sensitive military judgments.

[24] Although courts in other situations have fashioned judicially created immunities, see Feres, it is not appropriate for us to do so in the present context.  Moreover, the creation of such an immunity would of necessity involve policy judgments.  It is much to be preferred for such

Presidential's contention that this suit is barred by the political question doctrine.

II. Political question doctrine

A. Interlocutory jurisdiction

We must first determine whether we have jurisdiction over the order denying Presidential's motion to dismiss on political question grounds. This Court has not addressed whether a denial of a motion to dismiss on political question grounds is immediately appealable,[25] and need not do so here. We may exercise pendent appellate jurisdiction over an order that is "inextricably intertwined with an issue that is properly before this Court on interlocutory appeal." S & Davis Int'l, Inc. v. Yemen, 218 F.3d 1292, 1297 (11th Cir. 2000) (punctuation omitted). Even if the order is inextricably intertwined, we have discretion to deny an appeal that has no other jurisdictional basis. Honduras Aircraft Registry, Ltd. v. Honduras, 129 F.3d 543, 545 (11th Cir. 1997).

---

policy judgments to be resolved by Congress. See Westfall, 484 U.S. at 300, 108 S. Ct. at 585 ("Congress is in the best position to provide guidance for the complex and often highly empirical inquiry into whether absolute immunity is warranted in a particular context."). We echo the sentiments of the Supreme Court. In light of the military's increasing use of private military contractors, we hope that this case might serve to alert the Pentagon and Congress of the need for appropriate legislation.

[25] But see Doe v. Exxon Mobil Corp., 473 F.3d 345, 353 (D.C. Cir. 2007) (concluding that a denial of a motion to dismiss on political question grounds is not a collateral order).

Here, the political question issue is inextricably intertwined with the issue of derivative Feres immunity. As discussed above, the only Feres policy that has significant application to private contractors is the need to avoid judicial interference with sensitive military judgments. The political question doctrine, grounded in the separation of powers, also operates to insulate sensitive military judgments from judicial review. See Aktepe v. United States, 105 F.3d 1400, 1403-04 (11th Cir. 1997). The legal issue thus overlaps, in significant part, the order over which we have jurisdiction. We also find it appropriate to exercise our discretion to take pendent appellate jurisdiction over Presidential's claim, in order to clarify the application of the political question doctrine to private military contractors (an issue that, pursuant to our disposition, will remain relevant on remand).

B. Political question doctrine

Presidential argues that the case must be dismissed because its resolution will require the court to decide a political question. A federal court has no authority to review a political question. See Marbury v. Madison, 5 U.S. 137, 170 (1803) ("Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court."). The political

question doctrine protects the separation of powers and prevents federal courts from overstepping their constitutionally defined role.  See Baker v. Carr, 369 U.S. 186, 210, 82 S. Ct. 691, 706 (1962) ("The nonjusticiability of a political question is primarily a function of the separation of powers."); Aktepe v. United States, 105 F.3d 1400, 1402 (11th Cir. 1997) (noting that the political question doctrine is "derived from the separation of powers").

In Baker v. Carr, 369 U.S. 186, 82 S. Ct. 691 (1962), the Supreme Court set out the six indicia of a political question:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Id. at 217, 82 S. Ct. at 710.  A case may be dismissed on political question grounds if — and only if — the case will require the court to decide a question possessing one of these six characteristics.  See id. ("Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence."); see also Aktepe, 105 F.3d at

1403 ("For invocation of the political question doctrine to be appropriate, at least one of these characteristics must be evident."). If the case would require the court to decide a political question, it must be dismissed for lack of jurisdiction. See Made in the USA Found. v. United States, 242 F.3d 1300, 1319 (11th Cir. 2001) (dismissing suit barred by political question doctrine for lack of jurisdiction); Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum, 577 F.2d 1196, 1201 (5th Cir. 1978) (same).

Presidential argues that adjudication of the instant case, involving an accident that occurred in Afghanistan during wartime, will require the district court to decide a political question. It is undoubtedly true that military activities often give rise to political questions. In one case involving the military, we observed that "[t]he interjection of tort law into the realms of foreign policy and military affairs would effectively permit judicial reappraisal of judgments the Constitution has committed to the other branches." Aktepe, 105 F.3d at 1404. Nevertheless, it is clear that not even military judgments are completely immune from judicial review. See Gilligan v. Morgan, 413 U.S. 1, 11-12, 93 S. Ct. 2440, 2446-47 (1973) ("[I]t should be clear that we neither hold nor imply that the conduct of the National Guard is always beyond judicial review or that there may not be accountability in a judicial forum for violations of law or for specific unlawful conduct by military

54

personnel, whether by way of damages or injunctive relief."); see also Baker, 369

U.S. at 211, 82 S. Ct. at 707 ("[I]t is error to suppose that every case or controversy

which touches foreign relations lies beyond judicial cognizance."). Accordingly,

we must apply the Baker factors to determine whether the suit against Presidential

will require the district court to reexamine a military judgment; and if so, whether

the military judgment is the kind that warrants application of the political question

doctrine.[26]


1. Will the case involve a decision that has been constitutionally committed to another branch?

The first Baker factor asks whether there is "a textually demonstrable

constitutional commitment of the issue to a coordinate political department."

Baker, 369 U.S. at 217, 82 S. Ct. at 710. This factor recognizes that, under the

separation of powers, certain decisions have been exclusively committed to the

legislative and executive branches of the federal government, and are therefore not

---

[26] No Court of Appeals has yet upheld the dismissal of a suit against a private military contractor on political question grounds. See Doe v. Exxon Mobil Corp., 473 F.3d 345, 355 (D.C. Cir. 2007) (noting this fact). Several district courts have. See Fisher v. Halliburton, Inc., 454 F. Supp. 2d 637 (S.D. Tex. 2006); Whitaker v. Kellogg Brown & Root, Inc., 444 F. Supp. 2d 1277 (M.D. Ga. 2006); Bentzlin v. Hughes Aircraft Co., 833 F. Supp. 1486 (C.D. Cal. 1993). See also Tozer v. LTV Corp., 792 F.2d 403, 405-07 (4th Cir. 1986) (where, in a suit against a private military contractor, the manufacturer of a Navy plane, the court used some separation of powers principles which also underlie the political question doctrine to support the Fourth Circuit's adoption of a government contractor defense).

subject to judicial review.

In Aktepe v. United States, 105 F.3d 1400 (11th Cir. 1997), we held that the first Baker factor applied to certain decisions concerning training made by the U.S. military. Aktepe involved an accident that took place during a joint training exercise involving both the Turkish and U.S. navies. A U.S. ship accidentally fired a live missile at one of the Turkish ships, resulting in several deaths and numerous injuries. Id. at 1402. The injured Turkish sailors (and the survivors of those who died) sued the United States under the FTCA.

We held that the suit implicated the first Baker factor. We observed that the text of the Constitution explicitly invests the political branches with authority over the military, and as a result, "[t]he Supreme Court has generally declined to reach the merits of cases requiring review of military decisions, particularly when those cases challenged the institutional functioning of the military in areas such as personnel, discipline, and training." Id. at 1403. To decide the Turkish sailors' negligence action, the court would have had to determine whether various members of the U.S. military exercised reasonable care during a training exercise. Id. at 1404. That would have required reexamination of core military decisions, including "Navy communication, training, and drill procedures." Id. Because those decisions are committed to the political branches, we dismissed the case on

political question grounds.  Id.

On similar grounds, the Fourth Circuit dismissed a case involving military judgments in Tiffany v. United States, 931 F.2d 271 (4th Cir. 1991).  There the pilot of a private plane failed to file a proper flight plan before he entered U.S. airspace.  Id. at 272.  As a result, the North American Air Defense Command ("NORAD") scrambled fighters to intercept him.  Id. at 274.  In the course of the intercept, a fighter collided with the pilot's plane, resulting in his death.  Id.  His survivor sued the United States, claiming negligence on the part of NORAD and its pilots.  Id. at 275.

The Fourth Circuit held that the suit was barred by the political question doctrine.  "The decisions whether and under what circumstances to employ military force are constitutionally reserved for the executive and legislative branches. . . . The strategy and tactics employed on the battlefield are clearly not subject to judicial review."  Id. at 277.  Because the suit would have required the court to apply negligence standards to NORAD's strategy and tactics in the sensitive area of national security, the Court held that the suit was barred.  Id. at 278.  Like the Aktepe Court in the context of military training, the Tiffany Court held that military judgments in the sensitive area of air defense were unreviewable.

The instant case is at least one step removed from both Aktepe and Tiffany

57

because it is against a private contractor, Presidential. Presidential is not, itself, a coordinate branch of the United States government. Nor is it, like the military, part of a coordinate branch of the United States government. To invoke the first Baker factor, Presidential must therefore carry a double burden. First, it must demonstrate that the claims against it will require reexamination of a decision by the military. See Baker, 369 U.S. at 210, 82 S. Ct. at 706 (first Baker factor protects other "branches of the Federal Government").[27] Then, it must demonstrate that the military decision at issue is, like those in Tiffany and Aktepe, insulated from judicial review.

We hold that Presidential has not satisfied the threshold requirement for invocation of the first Baker factor, at least on the limited record now before us that the instant case will require reexamination of any decision made by the military.[28]

---

[27] All the district court cases dismissing suits against private military contractors on political question grounds have found, as they must, that the suit would involve reexamination of a decision by the military. See Fisher, 454 F. Supp. 2d at 643; Whitaker, 444 F. Supp. 2d at 1282; Bentzlin, 833 F. Supp. at 1497.

[28] On appeal, Presidential has asked us to consider evidence beyond what the district court considered — primarily declarations from its employees which Presidential suggests tend to demonstrate that the military made certain decisions with respect to the operation of the flight on the day in question. McMahon moved to strike these declarations (and other pieces of extraneous evidence) on the basis that they were not considered by the district court. McMahon's motion has been carried with the case. For several reasons, we decline to consider this evidence in the first instance, and accordingly grant McMahon's motion to strike.

In the first place, even if, as Presidential argues, we may have authority to entertain such evidence to ascertain subject matter jurisdiction, we believe Presidential invited the district court to restrict the scope of the evidence it considered. Presidential itself moved in the district court

58

McMahon alleges that Presidential negligently staffed, equipped, and otherwise operated the flight in question. These allegations relate to areas of responsibility reserved to Presidential by the Statement of Work (SOW). On the most general level, the SOW required Presidential to "[p]rovide all fixed-wing aircraft, personnel, equipment, tools, material, maintenance, **and supervision** necessary to perform Short Take-Off and Landing (STOL) passenger, cargo, or passenger and cargo air transportation services" for the missions DOD requested (emphasis added). The SOW then required Presidential to "assign a Project Manager (PM) authorized to manage and administer all terms and conditions of this contract."

---

to strike the extraneous evidence it now wishes us to consider. Presidential first asked the magistrate judge to strike such evidence, and appealed the magistrate judge's denial of that motion to the district court. Although Presidential now claims that it narrowed its objection to the extraneous evidence in the district court, our review of the record persuades us that Presidential invited the district court to do exactly what it did, i.e., consider only the complaint, the contract, and the Statement of Work. In the district court, Presidential did acknowledge that the court could consider facts extraneous to the complaint in ruling upon subject matter jurisdiction pursuant to Rule 12(b)(1). But Presidential repeatedly insisted that it was not relying upon any such extraneous facts, and ultimately urged the court to reverse the magistrate judge's denial of Presidential's Motion to Strike. Accepting Presidential's invitation, the district court did grant Presidential's motion to strike the extraneous evidence. In its final ruling on the motion to dismiss, the district court indicated that, notwithstanding its previous grant of Presidential's Motion to Strike, it would consider the Statement of Work because both Presidential and McMahon had referred to it in the hearing on the motion to dismiss.

As a result of all this, the district court considered only the complaint, the contract, and the Statement of Work in ruling on Presidential's political question argument. We decline to attempt to evaluate in the first instance evidence which Presidential invited the district court to ignore. We prefer instead to have the benefit of the district court's evaluation and findings of fact. In addition, McMahon should have an opportunity to have discovery to rebut any such extraneous evidence, before such evidence is used to dismiss the case on political question grounds. We therefore consider only the contract and the Statement of Work and the allegations in McMahon's complaint in our discussion of Presidential's political question argument.

59

The SOW thus envisioned that Presidential was to have general responsibility for making the decisions regarding the flights it provided to DOD.

The SOW further gave Presidential the ultimate responsibility of ensuring the safety of the flights it was operating. It provided that "[t]he contractor shall develop and implement a commercial quality control plan to ensure safe and reliable air transportation in accordance with FAR 135 and 32 CFR 861," and thus required Presidential to operate in a way that complied with those regulations. Presidential's supervisory authority is made especially clear by 32 C.F.R. § 861, which contains the DOD's own standards for commercial carriers. This regulation required Presidential to "supervise crew selection," "ensure the risk associated with all flight operations is reduced to the lowest acceptable level," "ensure that applicants [for flight crew] are carefully screened," and "ensure[] the proper pairing of aircrews on all flights," among other duties. 32 C.F.R. § 861.4. Finally, the SOW also provided that "[t]he contractor may refuse any mission for safety reasons." The existence of this power tends to show that Presidential, and not DOD, was ultimately responsible for ensuring that the flights it provided were operated in a reasonably safe manner.

While Presidential had these general supervisory responsibilities according to the SOW, the military's duties (according to the SOW) were relatively discrete.

60

The military chose the start and end points of the flights, and chose when the flights would be flown (qualified by Presidential's power to decline a mission for safety reasons). The military also imposed certain constraints on Presidential's exercise of its supervisory responsibilities. It limited the working hours of Presidential's pilots; specified minimum requirements for the aircraft; set out minimum and maximum amounts of passengers and cargo; and contained a provision requiring Presidential employees to comply with General Order One (which contained general rules of conduct for all service members in Afghanistan). Finally, the military took on certain responsibilities while Presidential employees were on the base. For example, the SOW provided that DOD would provide protection for the contractor while it was on military bases.

It is not evident that McMahon's allegations relate to any of these discrete areas of military responsibility.[29] She does not challenge the military's scheduling of the flights; the force protection the military provided on the base; or the military's generalized restrictions on Presidential employees while they were on the base pursuant to General Order One. Rather, her allegations relate principally to the operation of the flight, for which Presidential retained residual responsibility

_____

[29] Even if one allegation did implicate a discrete area of military responsibility, and even if the court's consideration thereof were barred, other allegations would have to be evaluated pursuant to the Baker factors. See Linder v. Portocarrero, 963 F.2d 332, 336 (11th Cir. 1992).

under the terms of the SOW.  McMahon alleges "[n]egligent failure to use reasonable care by entrusting an aircraft to a flight crew inexperienced in flying the mountainous terrain of Afghanistan"; "[n]egligent failure to conduct a formal route study"; "[n]egligent failure to properly supervise route planning and flight planning activities"; "[n]egligent failure to properly plan and execute the . . . flight"; and other challenges to the operational details of the flight.  None of these allegations relate to the military's discrete areas of responsibility under the SOW.  Nor is McMahon challenging, on any level, the military's ultimate decision to use private contractors to transport soldiers in Afghanistan.  Rather, she is challenging the way in which Presidential performed the duties it was given by the military.  At this stage of the proceeding, Presidential has therefore not shown that resolution of McMahon's negligence claims will require reexamination of any decision made <u>by</u> the U.S. military.[30]

In this respect, the case is far different from <u>Aktepe</u>.  There it was obvious,

---

[30] To take a discrete example, McMahon alleges that Presidential negligently chose pilots who had limited experience flying missions in Afghanistan.  There is no indication in the SOW that the military had any role in choosing the pilots.  If, as McMahon alleges, the crash was caused by the inexperience of the particular pilots Presidential chose, then the prosecution of this suit would not require the court to second-guess any decision made by the U.S. military.  McMahon's other allegations also relate to Presidential's overarching duty of providing "supervision necessary to perform" the missions DOD ordered.  As a result, it is not evident that her allegations will involve a political question, and dismissal on that ground would be premature.

even from the complaint, that the suit would require the court to review actual, sensitive judgments made by the military. See Aktepe, 105 F.3d at 1404 (noting that even under the most generous reading of the complaint, the suit would "require the judiciary to determine whether members of the Sea Sparrow missile team should have demanded confirmation of their superior's apparent instruction to fire a live missile"). Here Presidential has not shown that McMahon's allegations will require examining a single military judgment. Presidential therefore has failed to show that such a judgment is "inextricable from the case at bar," Baker, 369 U.S. at 217, 82 S. Ct. at 710, as would be required to bar the suit.

Presidential's inability to identify a military judgment that would be implicated by the case also makes it different from the district court cases that have dismissed suits against a private military contractor on political question grounds. In Whitaker v. Kellogg Brown & Root, Inc., 444 F. Supp. 2d 1277 (M.D. Ga. 2006), the survivor of a service member alleged that a private contractor's trucks that were part of his convoy ran into the soldier's truck, causing him to fall off a bridge to his death. Id. at 1278. The court concluded that the suit would necessarily call into question military judgments because "[t]he Army regulates all aspects of control, organization, and planning of Army convoy operations." Id. at 1279. According to the court, that kind of suit "necessarily implicates the wisdom

63

of the military's strategic and tactical decisions, a classic political question over which this Court has no jurisdiction." Id. at 1282. The other district court cases dismissing suits against private contractors have similarly found that the resolution of the case would necessarily require review of a military decision. See Fisher, 454 F. Supp. 2d at 643 (same); Bentzlin, 833 F. Supp. at 1497 (same).

By contrast, Presidential has not shown that the military retained control or responsibility over the aspects of Presidential's operations that McMahon is challenging in the instant case. At this early stage of the litigation, we therefore cannot say it is evident that McMahon's suit will call into question decisions made by the military, much less the kind of military decisions that might be insulated by the political question doctrine. McMahon's allegations involve decisions that (on the record before us) Presidential was responsible for making. As a result, this prong of Baker does not, as yet, justify dismissal.[31]

---

[31] Of course, if further development of the record on remand prompts the district court to determine that a decision or judgment of the military caused (in whole or substantial part) the injuries to McMahon, then a different issue may well be presented. The district court will have to evaluate the circumstances pursuant to the standards set out in Gilligan v. Morgan, Baker v. Carr, Aktepe v. United States, and other relevant precedents. See Baker, 369 U.S. at 211-12, 102 S.Ct. at 707 ("Our cases in this field seem invariably to show a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in light of its nature and posture in the specific case, and of the possible consequences of judicial action."). Moreover, depending upon the facts and circumstances as they may develop, the district court may decide to renew its invitation to the United States to intervene.

2. Does the suit involve a lack of judicially discoverable and manageable standards?

The second Baker factor applies when there is "a lack of judicially discoverable and manageable standards for resolving" the case. Baker, 369 U.S. at 217, 82 S. Ct. at 710. Courts have frequently held that certain military judgments are outside the competence of courts. In Gilligan v. Morgan, 413 U.S. 1, 93 S. Ct. 2440 (1973), the Supreme Court held that a suit against the Ohio National Guard in the wake of the Kent State incident was barred on political question grounds. The Court stated, "[I]t is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments," unsuitable for judicial resolution. Id. at 10, 93 S. Ct. at 2446; see also Boyle, 487 U.S. at 511, 108 S. Ct. at 2518 (precluding certain tort suits against military contractors where military requested a certain design because such military decisions "involve[] not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness").

In Aktepe, we found that the political question doctrine applied, in part

because there are no judicially manageable standards to apply to the training activities of the United States military:

> In order to determine whether the Navy conducted the missile firing drill in a negligent manner, a court would have to determine how a reasonable military force would have conducted the drill . . . . Decisions relative to training result from a complex, subtle balancing of many technical and military considerations, including the trade-off between safety and greater combat effectiveness. . . . [C]ourts lack standards with which to assess whether reasonable care was taken to achieve military objectives while minimizing injury and loss of life.

Aktepe, 105 F.3d at 1404. Similarly, in Tiffany (the case involving the allegedly negligent NORAD intercept), the Fourth Circuit's dismissal was based in part on a lack of judicial competence: "Courts cannot impose their own concept of 'the prudent intercept' on NORAD. . . . Any judgment we might render would lay upon NORAD a strata of tort law which would be both capricious and confining in its impact." Tiffany, 931 F.2d at 279.

Presidential has not only failed to show the existence of a military judgment that might be implicated by this suit, it has also failed to show that the case will require the application of judicially unmanageable standards. Unlike Aktepe and Tiffany, it is not evident on the limited record in the instant case that a court would have to develop a concept akin to a "reasonable intercept" or a "reasonable military training exercise." The allegations do not involve combat, training activities, or

66

any peculiarly <u>military</u> activity at all.[32]  McMahon alleges that Presidential

negligently staffed, equipped, and otherwise operated its flights.  As in any tort suit

involving a plane crash, the court will simply have to determine whether the

choices Presidential made were negligent.  It is well within the competence of a

federal court to apply negligence standards to a plane crash.  <u>See</u> <u>Baker</u>, 369 U.S. at

226, 82 S. Ct. at 715 (refusing to dismiss in part because "[j]udicial standards under

the Equal Protection Clause are well developed and familiar").

   We readily acknowledge that flying over Afghanistan during wartime is

different from flying over Kansas on a sunny day.  But this does not render the suit

inherently non-justiciable.  While the court may have to apply a standard of care to

a flight conducted in a less than hospitable environment, that standard is not

inherently unmanageable.  <u>See</u> <u>Linder v. Portocarrero</u>, 963 F.2d 332, 337 (11th Cir.

---

[32] The district court cases that have dismissed suits against private contractors on political question grounds all involved combat activities.  <u>See</u> <u>Fisher</u>, 454 F. Supp. 2d at 641-43 (incident involved enemy attack on convoy including trucks of the private military contractor driven by plaintiff's deceased and including Army personnel providing security; review of evidence showed Army was responsible for security, intelligence, selection of route, and manner in which drivers were to operate; holding that the court could not try the case, set on the battlefield, without being drawn into an examination of Army decisions and without intruding into powers expressly granted to the Executive by the Constitution); <u>Whitaker</u>, 444 F. Supp. 2d at 1281-82 (also involving suit against private military contractor engaged in wartime convoy operation planned and executed by the military (including placement of vehicles in the convoy, distance between them, rate of speed, and escorted by military providing security), and alleging negligence of contractor's employee who was performing duties subject to the military's planning, orders, and regulations); <u>Bentzlin</u>, 833 F. Supp. at 1497 (soldier killed by friendly fire during first Gulf War, holding that case would require inquiry into possible causes of the friendly fire, necessarily requiring inquiry into military strategy and orders to pilots and ground troops).

1992) (rejecting political question challenge to tort suit arising out of activity of Nicaraguan contras, and noting that "the common law of tort provides clear and well-settled rules on which the district court can easily rely") (quoting Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44, 49 (2d Cir. 1991)). The flexible standards of negligence law are well-equipped to handle varying fact situations. The case does not involve a sui generis situation such as military combat or training,[33] where courts are incapable of developing judicially manageable standards. Presidential is therefore not entitled to dismissal on the basis of the second Baker factor.[34]

3. Other Baker factors

---

[33] As noted above, it is not even evident that this case will involve a challenge to a military decision, or a decision by Presidential which was controlled by the military.

[34] Our decision in this regard is strengthened by the fact that this is a suit for damages. As the Ninth Circuit noted in rejecting a political question argument in Koohi v. United States, 976 F.2d 1328 (9th Cir. 1992),"[a] key element in our conclusion that the plaintiffs' action is justiciable is the fact that the plaintiffs seek only damages for their injuries. Damage actions are particularly judicially manageable. By contrast, because the framing of injunctive relief may require the courts to engage in the type of operational decision-making beyond their competence and constitutionally committed to other branches, such suits are far more likely to implicate political questions." Id. at 1332. The Supreme Court too, in its leading case on the political question doctrine in the military context, took care to emphasize that "this is not a case in which damages are sought for injuries sustained during the tragic occurrence at Kent State." Gilligan, 413 U.S. at 5, 93 S. Ct. at 2443; see also Ibrahim v. Titan Corp., 391 F. Supp. 2d 10, 15 (D.D.C. 2005) (in suit against contractors involved in Abu Ghraib scandal, noting that "[a]n action for damages arising from the acts of private contractors and not seeking injunctive relief does not involve the courts in overseeing the conduct of foreign policy or the use and disposition of military power") (punctuation omitted). In the instant case, McMahon does not request continuous judicial oversight of military activities. It is merely a suit for tort damages, and for this reason too, is less likely to implicate the second Baker factor.

68

Finally, Presidential has not yet demonstrated that the other Baker factors apply to this case, for essentially the same reasons discussed above.[35] As the case appears to be an ordinary tort suit, there is no "impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion." Baker, 369 U.S. at 217, 82 S. Ct. at 710. There is also no evident "impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government," id., because Presidential has not shown that the suit will implicate a decision made by a coordinate branch of government. For the same reason, there is no "unusual need for unquestioning adherence to a political decision already made" or "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." Id. Presidential simply has not shown that the case implicates any "political decision" or decision made by any other "department[]" of government. Id.

Finally, we note that to this point the United States has not intervened in the instant case, despite an invitation to do so. We have previously found the opinion

---

[35] A plurality of the Supreme Court has stated that the Baker factors are listed in decreasing order of importance. See Vieth v. Jubelirer, 541 U.S. 267, 278, 124 S. Ct. 1769, 1776 (2004). In any event, we have on a previous occasion found it "useful" to collapse the factors into three. See Made in the USA Found., 242 F.3d at 1312 ("(i) Does the issue involve resolution of questions committed by the text of the Constitution to a coordinate branch of government? (ii) Would resolution of the question demand that a court move beyond areas of judicial expertise? (iii) Do prudential considerations counsel against judicial intervention?"). We find an abbreviated discussion of the last four factors to be equally appropriate here.

69

of the United States significant in deciding whether a political question exists. See Occidental, 577 F.2d at 1204 n.14 (noting that "it is . . . clear that whether the state department believes that judicial action would interfere with its foreign relations is germane to whether a court may decide actions involving foreign relations"). The apparent lack of interest from the United States to this point fortifies our conclusion that the case does not yet present a political question.

We expressly do not (and could not) hold that this litigation will not at some point present a political question. The existence of a political question deprives a court of jurisdiction. See Made in the USA Found., 242 F.3d at 1319. As a result, Presidential remains free to assert the argument at any time, and the district court has an independent obligation to make sure that the disposition of the case will not require it to decide a political question.

But at this juncture, when almost no discovery has been completed, we cannot say that resolution of this case will require the court to decide a political question. The evidence before us does not show a conflict between the allegations in the complaint and decisions made by the U.S. military. It would be inappropriate to dismiss the case on the mere chance that a political question may eventually present itself. See Ibrahim, 391 F. Supp. 2d at 16 (noting in litigation against Abu Ghraib contractors that "[m]anageability problems may well emerge as

70

the litigation in this case proceeds . . . . The government is not a party, however, and I am not prepared to dismiss otherwise valid claims at this early stage in anticipation of obstacles that may or may not arise."). We therefore affirm the district court's refusal to dismiss the case on the basis of the political question doctrine.[36]

III. Preemption based on the combatant activities exception

Finally, Presidential argues that McMahon's state law tort claim is preempted pursuant to a rationale based upon the combatant activities exception to the FTCA. We have considerable doubt that this theory is inextricably intertwined with the arguable claim of derivative Feres immunity upon which our appellate jurisdiction is based. In any event, we decline to exercise discretion to entertain this theory pursuant to the doctrine of pendent appellate jurisdiction. See Honduras Aircraft Registry, 129 F.3d at 545.

---

[36] We emphasize that our decision is based only on the record considered by the district court: the complaint, the contract, and the SOW. Presidential remains free to argue that other evidence justifies dismissal on political question grounds. The Supreme Court has indicated that the political question issue necessitates a "discriminating inquiry into the precise facts . . . of the particular case." Baker, 369 U.S. at 217, 82 S. Ct. at 710; see also id. at 211-12, 82 S. Ct. at 707 ("Our cases . . . seem invariably to show a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling . . . , and of the possible consequences of judicial action.").

IV. Conclusion

For the foregoing reasons, the judgment of the district court is

**AFFIRMED.**