# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-CA-00125-SCT

*NARJESS GHANE, INDIVIDUALLY AND ON BEHALF OF THE WRONGFUL DEATH BENEFICIARIES OF SHAPOOR ALEXANDER ("ALEX") GHANE, JR.*

*v.*

*MID-SOUTH INSTITUTE OF SELF DEFENSE SHOOTING, INC., A TENNESSEE CORPORATION; JFS, LLC, A MISSISSIPPI LIMITED LIABILITY COMPANY; JOHN FRED SHAW; DONALD ROSS SANDERS, JR. AND JIM COWAN*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/20/2011 |
| TRIAL JUDGE: | HON. ROBERT P. CHAMBERLIN |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | BENJAMIN LOUIS TAYLOR |
| ATTORNEYS FOR APPELLEES: | JAY MARSHALL ATKINS |
| | THOMAS P. CASSIDY, JR. |
| | JEFFREY EDWARD NICOSON |
| | ROBERT Q. WHITWELL |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED IN PART; REVERSED IN PART; REMANDED - 01/16/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CHANDLER, JUSTICE, FOR THE COURT:**

¶1.    This wrongful death action was brought against a private military contractor by

Narjess Ghane, the mother of a deceased member of the Navy's Sea, Air, and Land Force

(SEAL) Team Five. Along with other members of SEAL Team Five, SO2[1] Sharpoor Alexander (Alex) Ghane Jr. was engaged in a live-fire, close-quarters combat training exercise at Mid-South Institute of Self Defense ("Mid-South") when a bullet allegedly penetrated a ballistic[2] wall, striking SO2 Ghane above his protective vest and killing him. Mid-South successfully moved for summary judgment on the ground that Mrs. Ghane's claim would require the trial court to question military policy and operational decisions, thus raising a nonjusticiable political question. The defendants had previously unsuccessfully moved for summary judgment on the ground that SO2 Ghane had signed a valid waiver of liability.

¶2. We reverse the trial court's grant of summary judgment pertaining to the political-question doctrine, and affirm the trial court's previous denial of summary judgment pertaining to the liability waiver. On the record before us, the defendants have failed to demonstrate that adjudication of this claim will require reexamination of matters inextricable from military policy and operational decisions. This tort action is based on the failure of the ballistic wall–a wall independently designed, constructed, and maintained by the defendants. The defendants have failed to demonstrate that military policy and operational decisions are essential to a determination of causation.

---

[1] Special Warfare Operator (Second Class). "In May 2006 the U.S. Navy authorized the establishment of the Special Warfare Operator (SO) general rating to allow Enlisted Sailors to focus on rating-specific technology, skill sets, and training systems . . . . As of October 1, 2006, the Enlisted SEAL Warfare Designation (NSW Rating) became "Special Warfare Operator" (SO), representing its own specialized navy career path." http://navyseals.com/nsw/learn-about-the-us-navy-seals/ (last visited January 3, 2014).

[2] Bullet-proof.

**FACTS AND PROCEEDINGS BELOW**

¶3.    Mid-South is a privately owned live-fire training facility that the Navy SEALS have frequently rented for training exercises since the mid-1980s. John Shaw, the former owner of Mid-South and fifty-percent owner of JFS, LLC, the entity that now owns the property on which Mid-South is located, testified that, in the late 1980s, the SEALS who were training at Mid-South requested that Mid-South build shoothouses with ballistic walls. Shaw constructed the initial shoothouse walls with eight-inch railroad ties on both sides filled with eight-inches of sand.

¶4.    The current general manager of Mid-South, Donald Sanders, testified that he was informally asked by the SEALS in the early 2000s to construct a shoothouse that more realistically represented structures the SEALS would encounter in the real world. Sanders and Shaw then designed and built thinner ballistic walls made of six-inch galvanized steel studs on each side, covered in an approximately three-eighths-inch-thick plastic, filled with limestone gravel. When designing and constructing the walls, they did not look to any other ranges, specifications, or guidebooks; nor did they consult an engineer. They tested the wall with multiple types of ammunition including rounds of 5.56mm "green-tip"[3] bullets and regular .308 caliber ammunition. According to Sanders, no rounds breached the walls, and the green tip bullets penetrated only one-third of the way through the walls. The tops of the walls were left open so that gravel levels could be observed and refilled as needed.

---

[3] "Green-tip" bullets contain a tungsten core designed to penetrate farther than a standard bullet. The 5.56mm military designation is comparable to a .223 caliber bullet.

¶5.    On January 30, 2008, SEAL Team 5 was training at Mid-South under direct orders from the U.S. Navy. The SEALS brought their own equipment, weapons, and ammunition. Navy range safety officers (RSOs) oversaw the close-quarter combat (CQC) training. The SEALS were using the twenty-eight room ballistic shoothouse to practice room clearing. As part of the training exercise, the RSO placed a hostile paper target on a ballistic wall while the SEALS were "stacked" immediately on the opposite side of the wall. During the course of the exercise, SO2 Ghane was struck by a .223 caliber round (5.56mm NATO) of "green-tip" ammunition above his protective vest. Despite receiving immediate medical attention, he died from the wound shortly after being struck.

¶6.    After the incident, both the Navy Criminal Investigative Services (NCIS) and Naval Special Warfare Group One (NSWG-1) conducted an investigation. A redacted copy of the subsequent NSWG-1 report was obtained by Mrs. Ghane through the Freedom of Information Act. The report includes extensive findings of fact, opinions, and conclusions. The following are excerpts from that report:

Findings of Fact

19. On or about October 18, 2007, the ST-5 Command master Chief (CMC) **expressed some concern** to Training Detachment (TRADET) personnel **about the training tactics** of [redacted].

20. **TRADET personnel responded that [said training tactics] could be practiced at Mid South because the shoot house walls were ballistic.**

47. [On the day SO2 Ghane died], At approximately 1400, [name redacted] entered a room followed by a number of [redacted] members including [name redacted] and SO2 Ghane.

50. SEAL team 5 members heard two snaps consistent with rounds exiting the wall at a high velocity and entering the first room.

51. As a result, SEAL Team 5 members on the other side of the wall were hit by debris and saw debris coming in the first room.

52. SO2 Ghane's teammates heard him exclaim, and then saw SO2 Ghane fall to the ground.

Opinions

1. SO2 Ghane's death occurred in the line of duty and not due to his own misconduct.

2. **The cause of SO2 Ghane's death was a defective Shoot House wall that did not provide the ballistic protection advertised by Mid South and paid for by the Navy**.

3. Despite the omission of SEAL Team FIVE's statement of work from the NSWG-1 contract, **Mid South knew that NSW units required ballistic protection sufficient for [green tip ammunition].** This opinion is supported by Mid South General Manager's statement acknowledging testing with [green tip ammunition], the website representation that the shoot house walls were ballistic, and years of instruction for NSW trainees using [redacted].
. . .

5. **Mid South comments concerning [redacted] training included representations that all walls in both shoot houses were ballistic**, that paper targets were sufficient **without bullet traps**, and that **target placement was unrestricted**.

6. **The design and construction of Mid South's current shoot house walls occurred ad hoc six years ago by the Mid South General Manager**, who did not have any formal training, certification, or license in range engineering.
. . .

8. **Possible design factors contributing to wall failure in this case include an insufficiently thick gravel wall, exposure of the interior gravel to changing weather conditions, and the lack of a ballistic steel plate within the wall.**

9. **The maintenance routine of randomly detecting and replacing worn plastic sheets and refilling low gravel levels was inadequate.** This system focused more on the appearance of the wall exterior and tops than the condition of the contents inside the walls that stop bullet penetration. As such, **that**

5

**inspection regime was not able to adequately determine interior wall ballistic properties and degradation.** Physical samples taken from the target area where the penetration occurred were clearly different from the gravel at the tops of the walls.

10. **The testing that was the basis for proclaiming the shoot house walls ballistic was inadequate.** The tests consisted of two repetitions, conducted six years ago, on the same wall, on the same day, under the same weather conditions, with new materials, and **no objective criteria for measuring failure rates over time.**

. . .

16. **The effectiveness of any [military] inspection of Mid South shoot house walls is limited by the walls' original design.** Mid South's current maintenance system is based on the appearance of non-ballistic exterior plastic retaining walls and the height of gravel levels at the top. **Under the current design, it is impossible to check for interior wall degradation throughout the shoot house without cutting open every wall.** Walls using ballistic steel allow inspectors to temporarily peel back the exterior material to inspect for interior degradation.

Recommendation

. . .

11. Recommend that no charges be brought against the TRADET safety officers on the scene. **The ultimate cause of SO2 Ghane's tragic death stems from defective walls that were not ballistic as advertised and paid for in this case.** While multiple factors, including the weather, ammunition, and tactics may have played a role, Naval Special Warfare's inability to detect that the ballistic shoot house was not designed, built, maintained, or tested based on formal objective standards was a systematic and critical failure. This oversight began the first time any naval Special Warfare unit used the current shoot house walls approximately six years ago and continued until January 30, 2008. As such, Naval Special Warfare shares a collective responsibility in this case. Therefore, we, as a community, owe the memory of Alex Ghane our best efforts to ensure that such a tragic loss never happens again.

(Emphasis added.)

¶7.    Mrs. Ghane filed suit against the defendants on January 30, 2009, specifically asserting that there were no allegations of comparative fault against any party not named as a defendant.

6

The defendants' answer asserted several affirmative defenses, including the comparative negligence of "the United States Navy, members of the United States Navy SEAL Team #5, and other members, officers or employees of the United States Navy."

¶8. The defendants first moved for summary judgment on the ground that SO2 Ghane had signed an unconditional release and hold-harmless agreement prior to training. The plaintiff argued that SO2 Ghane was not a student at Mid-South at the time of his death, but rather was there under orders from the military and therefore did not fall within the scope of the release. The trial court denied the defendants' motion for summary judgment, finding that questions of fact remained as to whether SO2 Ghane had released the defendants from "liability for the walls the Defendants claimed could not be penetrated by the ammunition being used by the [SEALS] that day, whether those representations were made, whether the walls were penetrated by said ammunition and [SO2 Ghane] killed as a result of the alleged misrepresentations and reckless disregard of the Defendants."

¶9. The defendants moved again for summary judgment on September 23, 2011, arguing that the plaintiff's claims raised a nonjusticiable political question because adjudication of the claim would require the trial court to question military training decisions and strategies. The trial court granted summary judgment to the defendants as to the political question doctrine. Mrs. Ghane appealed.

## DISCUSSION

### I. THE POLITICAL-QUESTION DOCTRINE

¶10.   Our standard of review of summary judgment and jurisdictional issues is *de novo*. ***Stringer v. Trapp***, 30 So. 3d 339, 341 (Miss. 2010); ***Jones v. Billy***, 798 So. 2d 1238, 1239 (Miss. 2001).

¶11.   The political-question doctrine is a function of the constitutional separation of powers and was famously first articulated by Chief Justice Marshall in ***Marbury v. Madison***, 5 U.S. (1 Cranch) 137, 170, 2 L. Ed. 60 (1803):

> The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion. Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court.

"The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." ***Japan Whaling Ass'n v. American Cetacean Soc.***, 478 U.S. 221, 230, 106 S. Ct 2860, 92 L. Ed 2d 166 (1986). Mississippi adopted the political question doctrine in ***In re Hooker***, 87 So. 3d 401 (Miss. 2012).

¶12.   In ***Baker v. Carr***, the United States Supreme Court provided six independent factors, any of which, if present, indicate the existence of a nonjusticiable political question:

1)   a textually demonstrable constitutional commitment of the issue to a coordinate political department; or

2)   a lack of judicially discoverable and manageable standards for resolving it; or

3)   the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or

8

4)      the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or

5)      an unusual need for unquestionable adherence to a political decision already made; or

6)      the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962). "Unless one of these formulations is *inextricable* from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence." *Id*. at 217 (emphasis added). In order to determine whether a case will implicate a political question, a court "must analyze appellant's claim as it would be tried, to determine whether a political question will emerge." *Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum Laden Aboard Tanker Dauntless Colocotronis*, 577 F. 2d 1196, 1202 (5th Cir. 1978). "The Constitution emphatically confers authority over the military upon the executive and legislative branches of government." *Haig v. Agee*, 453 U.S. 280, 292, 101 S. Ct. 2766, 2744, 69 L. Ed 2d 640 (1981). However, "not all cases involving the military are automatically foreclosed by the political-question doctrine." *Carmichael v. Kellogg, Brown & Root Services, Inc.*, 572 F. 3d 1271, 1281 (11th Cir. 2009).

¶13.      Private contractors are a significant step removed from the separation-of-powers concerns targeted by the political-question doctrine and the *Baker* factors. They "do not have independent constitutional authority and are not coordinate branches of government to which we owe deference." *Taylor v. Kellogg, Brown & Root Servs., Inc.*, 658 F. 3d 402, 409 (4th Cir. 2011). Private contractors therefore must meet a "double burden" in order to receive the

9

protection of the political-question doctrine. *McMahon v. Presidential Airways, Inc.*, 502 F. 3d 1331, 1359 (11th Cir. 2007). "First, [they] must demonstrate that the claims against [them] will require reexamination of a decision by the military. . . . [t]hen, [they] must demonstrate that the military decision at issue is . . . . insulated from judicial review." *Id.* at 1359-1360. In negligence actions against private contractors, the question of causation is particularly relevant in evaluating whether a political question will be implicated: "[i]f we must examine the [military's] contribution to causation, 'political question' will loom large." *Lane v. Halliburton*, 529 F. 3d 548, 561 (5th Cir. 2008).

¶14.    Here, we find that the defendants have failed to demonstrate that adjudication of the ballistic wall's failure would implicate a political question. On the facts before us, this case does not require reexamination of decisions made by the military and can be tried under the "judicially discoverable and manageable standards" of well-established state tort law.

¶15.    The question of causation comes down to the design, construction, and maintenance of a ballistic wall at a rented training facility–conditions which were in place *before* the military took "operational control" of the facility. Before the training exercise occurred, Mid-South independently had designed, constructed, and tested the shoothouse walls, representing them to be capable of withstanding the ammunition used and the training tactics employed. The Navy investigation found:

> 5. **Mid South comments concerning [redacted] training included representations that all walls in both shoot houses were ballistic**, that paper targets were sufficient **without bullet traps**, and that <u>**target placement was unrestricted**</u>.

10

(Emphasis added.) Based on these representations, the "military operational control" that provides the context for this case is irrelevant to adjudication of the claim against Mid-South.

¶16.    In *McMahon v. Presidential Airways, Inc.*, 502 F. 3d 1331 (11th Cir. 2007), the Eleventh Circuit found no political question implicated[4] where the plaintiff alleged that the defendant contractor "negligently staffed, equipped, and otherwise operated [a flight transporting three soldiers that crashed into a mountain]. These allegations relate to areas of responsibility reserved to [the defendant contractor] by [the defendant's contract with the military]." *Id*. at 1360. Here, the allegations relate to Mid-South's contractual obligation to provide a training facility that would perform as represented. Again from the Navy report:

> 3. . . . **Mid South knew that NSW units required ballistic protection sufficient for [green-tip ammunition].** This opinion is supported by Mid South General Manager's statement acknowledging testing with [green tip ammunition], the website representation that the shoot house walls were ballistic, and years of instruction for NSW trainees using [redacted].

(Emphasis added.)

¶17.    This case is distinguishable from *Aktepe v. United States*, 105 F. 3d 1400 (11th Cir. 1997), where a political question was implicated in a suit against the military where, during a joint training exercise, a U.S. ship accidentally fired a live missile at a Turkish ship. The court accurately stated that "[t]he Supreme Court has generally declined to reach the merits of cases requiring review of military decisions, particularly when those cases challenged the institutional functioning of the military in areas such as personnel, discipline, and training."

---

[4] We note that the court found no political question implicated on the record before it, and left open the possibility that further development of the case might implicate a political question. *Presidential Airways, Inc.*, 502 F. 3d at 1360.

*Id*. at 1403. Unlike the case at hand, *Aktepe* was brought directly against a coordinate branch of government and directly challenged a military decision. Further, while SO2 Ghane's death occurred during the course of a training exercise, there is no claim that negligent military execution of the exercise caused his death.

¶18.    This same logic distinguishes this case from several recent circuit cases Mid-South cites for the proposition that military operational control over contractors implicates a political question. "Military control over a contractor's actions is one common way that evaluation of military decisions becomes necessary." *Harris v. Kellogg, Brown & Root Servs., Inc.*, 724 F. 3d 458, 458 (3rd Cir. 2013). In *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F. 3d 1271 (11th Cir. 2009), the Eleventh Circuit dismissed a case against a military contractor where a vehicle driven by a KBR employee rolled over while transporting fuel on a dangerous route in a military convoy. There, "military judgments governed the planning and execution of virtually every aspect of the convoy in which [the sergeant] was injured." *Id*. at 1281. But there is no logical parallel between military control of a live convoy mission and the condition of a ballistic wall at a rented facility.

¶19.    A district court in Pennsylvania recently concluded that "[a]djudicating whether [defendant contractors] were required to warn of the dangers of asbestos in connection with the supply of propulsion turbines to the Navy for use in Navy warships does not implicate a political question:"

> Defendants contend that the court will necessarily have to rule on the prudence of the Navy's use of asbestos . . . [but] **[p]laintiff's claims do not challenge the Navy's wisdom in deciding to use asbestos**, nor do they seek to second guess the Navy's judgment as to the wisdom or propriety of its warning policy. Moreover, if successful, the claims will not make the Navy liable for any injury

. . . .To be sure, a judicial inquiry into what Navy policy was . . . at the time Plaintiff served on a Navy vessel may be required. Yet, this inquiry does not implicate the wisdom and soundness of the Navy's policies or procedures. The issue here is what the policy was with respect to warnings, not what it might (or should) have been . . . .

***Donn v. A.W. Chesterton Co., Inc.***, 842 F. Supp. 2d 803, 815-16 (E.D. Penn. 2012) (emphasis added). The court went on to distinguish ***Carmichael*** and related cases the way we distinguish them here:

These cases . . . . traverse a common thread different from this case. **They require the courts to second guess military operational judgment**, whether that be the speed and timing by which to send a military convoy through Iraq, or the wisdom of the military's procedures for electrical repairs . . . . Indeed, adjudicating the claims in ***Carmichael*** and ***Taylor*** would require the Court to determine in hindsight whether the military policy was correct . . . . **Thus, those cases present the type of claims the political question doctrine seeks to preclude from judicial review–claims that require courts to determine the wisdom of military policy.**

*Id*. at 817-18 (emphasis added). Mrs. Ghane does not ask the trial court to question the wisdom of the training tactics used by the military on the day SO2 Ghane died. Rather, the focus of this case is on the "defendants' performance of its contractual obligations to the government . . . rather than the advisability of any governmental policy-related decision." ***Bixby v. KBR, Inc.***, 748 F. Supp. 2d 1224 (D. Or. 2010) (refusing dismissal of negligence suit against contractor). The Navy's extremely thorough internal report demonstrates that the Navy felt free to "practice like we will fight" because Mid-South had first represented that its training facility was designed to handle such practice safely.

¶20. The defendants also fail to demonstrate that they will put forward a viable contributory negligence defense. Mississippi tort law allows for determination of percentage of fault in

civil cases.[5] A jury would inevitably be required to reexamine military decisions if tasked with apportioning percentage of fault between the Navy and the defendants.[6] But Mrs. Ghane's claim that the ballistic wall failed can "stand alone without implicating any decision committed to the discretion of the military." ***McMahon v. Gen. Dynamics Corp., et al.***, 933 F. Supp. 2d 682, 695 (D.N.J. 2013). A New Jersey district court rejected a contractor's argument that the manner in which it intended to defend itself would implicate a political question:

> [The defendant] states that it will defend itself in a manner that will drag the Court into exacting evaluations of the Army's policies and the actions of its soldiers . . . . **That argument is too broad; it would give defendants too much power to define the issues. Indeed, it would bar virtually any claim in which the contractor posited that the military, not itself, was at fault.** In the great majority of cases dismissing claims on political question grounds, the allegedly faulty exercise of military judgment was the basis of the complaint, not of a hypothetical defense. **[The plaintiff] does not challenge any order he was given**, or indeed anything that occurred in Afghanistan. **His allegation of a manufacturing defect could stand alone without implicating any decision committed to the discretion of the military**.

*Id*. (emphasis added).

¶21.  Sufficient evidence has been presented to allow this wrongful death action to proceed based on the allegation that the bullet penetrated the shoothouse wall because the wall's design, construction, and maintenance was other than what it was represented to be by the defendant–ballistic–without contributory negligence by the Navy. Mid-South was acting independent of military control when it responded to the SEALS' informal request for a more

---

[5] *See* Miss. Code Ann. § 85-5-7 (Rev. 2011); Miss. Code Ann. § 11-7-15 (Rev. 2004); ***Fielder v. Magnolia Beverage Co.***, 757 So. 2d 925, 933 (Miss. 1999). A jury can apportion a percentage of fault even to an immune nonparty.

[6] *See **Harris v. Kellogg, Brown & Root Servs., Inc.***, 724 F. 3d 458 (3rd Cir. 2013).

14

realistic ballistic wall by designing a wall "ad hoc," without consulting an engineer or following any established specifications, military or otherwise.[7] The defendants have failed to demonstrate that the military's training tactics–such as SO2 Ghane's position in the shoothouse, the placement of targets, and the choice of ammunition–exceeded the scope of what Mid-South represented its facility could handle.[8] Military policy and training tactics are therefore irrelevant for purposes of causation.

¶22. Mid-South's liability for the defective wall would not be lessened by the Navy's conclusion that different Navy oversight policies could have prevented this tragedy. The "collective responsibility" assumed by the Navy does not translate into apportioned tort liability. That "admission" addresses additional safety policies beyond and distinct from Mid-South's liability for failing to provide a facility that performed as represented to the Navy. On the record before us, adjudication of the claim under state tort law will not implicate a political question. We therefore reverse the trial court's grant of summary to the defendants.

## II. THE RELEASE SO2 GHANE SIGNED DID NOT RELIEVE MID-SOUTH FROM LIABILITY.

¶23. We affirm the trial court's denial of the defendant's first motion for summary judgment arguing that SO2 Ghane signed a release prior to training exculpating defendants from liability. Mississippi law "does not look with favor on contracts intended to exculpate a party from the liability of his or her own negligence although, with some exceptions, they are

---

[7] This distinguishes this case from *Boyle v. United Technologies*, 487 U.S. 500, 108 S. Ct. 2510, 101 L. Ed 442 (1988), where a claim against a private jet manufacturer was nonjusticiable where the military had particularly requested a certain type of jet engine.

[8] The defense's argument may be analogized to a mother saying that, if she had not asked her son to go to the store, he would not have been killed by a drunk driver.

enforceable." ***Turnbough v. Ladner***, 754 So. 2d 467, 469 (Miss. 1999) (citations omitted). "[W]e do not sanction broad, general 'waiver of negligence' provisions, and strictly construe them against the party asserting them as a defense." ***Id***. In ***Turnbough***, a scuba diving student brought suit against his instructor after he because ill with decompression sickness after participating in her scuba certification classes, alleging that the instructor was negligent in planning the depths of the dives and in failing to make necessary safety stops during the dive. ***Id***. at 468. We reversed the trial court's grant of summary judgment to the defendant (based on the plaintiff's signing a waiver of liability):

> Assuming [the student] was aware of the inherent risks in scuba diving, it does not reasonably follow that he, a student, intended to waive his right to recover from [the instructor] for failing to follow . . . basic industry safety standards.

We found that the student "did not knowingly waive his right to seek recovery for injuries caused by the instructor's failure to follow basic safety guidelines that should be common knowledge to any instructor of novice students." ***Id***. at 470. We further found that "contracts attempting to limit the liabilities of one of the parties would not 'be enforced unless the limitation is fairly and honestly negotiated and understood by both parties'" and that, because the contract was preprinted and not negotiated, the terms should be "strictly construed against the party seeking to enforce such a provision." ***Id***. (citations omitted).

¶24.    We find that the trial court correctly denied the defendants' motion for summary judgment at this stage. The release SO2 Ghane signed was a preprinted, general release. As in ***Turnbough***, it is not reasonable that SO2 Ghane, an experienced Navy SEAL, intended to release the defendants from following even basic safety standards in the design of the ballistic wall or the failure of the wall to perform as advertised. We further find merit to the plaintiff's

16

argument that SO2 Ghane does not fall within the scope of the release because he was not a "student" being taught or instructed by Mid-South at the time of his death, as he was under orders from the military to train at the facility.

## CONCLUSION

¶25.    The political-question doctrine rarely operates to bar a plaintiff's claim and does not operate to do so here. On the facts before us, the defendants have not met their burden to show that Mrs. Ghane's wrongful death claim is inextricable from the formulations established by the ***Baker*** factors and cannot be adjudicated without implicating a political question. We therefore reverse the trial court's grant of summary judgment as pertains to the political-question doctrine. We affirm the trial court's denial of summary judgment as to the liability waiver.

¶26.    **AFFIRMED IN PART; REVERSED IN PART; REMANDED**.

**RANDOLPH, P.J., KITCHENS, PIERCE AND KING, JJ. CONCUR. DICKINSON, P.J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION. LAMAR, J. DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J., AND COLEMAN, J.**

**DICKINSON, PRESIDING JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶27.    My disagreement with the majority is minor. I agree that the trial court properly denied summary judgment as to liability. And I agree that we should reverse the trial court's grant of summary judgment on the political-question doctrine, but not because it does not apply in this case. We do not know whether it does. The Navy has neither raised it nor intervened in this case to assert it.

17

¶28. The defendant, Mid-South, attempts to raise it on behalf of the Navy, claiming the doctrine will somehow prevent it from fully defending the claims filed against it. But no person from the Navy has refused to testify or respond to a subpoena. And Mid-South has made no showing that the Navy's redactions from the NSWG-1 report materially affected its ability to defend itself. For these reasons, I would reverse the trial court's grant of summary judgment on the political-question doctrine because it is not ripe for review.

**LAMAR, JUSTICE, DISSENTING:**

¶29. I agree with the majority that Plaintiff's liability theories are based on simple negligence by Mid-South in the construction of the ballistic wall. And I agree that the resolution of that issue would not require an evaluation of military decisions. But, although Plaintiff does not challenge military decisions, Mid-South has raised defenses concerning proximate causation and comparative negligence that will require the fact-finder to evaluate decisions and training strategies of the military, thus presenting a nonjusticiable issue. Questions of justiciability must be resolved before one reaches the merits of the case. The issue we must decide is whether Defendants have presented enough evidence to present a jury question as to whether the military decisions contributed to SO2 Ghane's death.

¶30. I include some additional facts that I believe are helpful to understanding this case. Although the Navy had regulations covering the design of ballistic walls at the time the current walls were designed and constructed, the SEALS never instructed Mid-South on how it should construct the walls, nor did they inform Mid-South of any standards the walls should meet. When the SEALS trained at Mid-South, they were under the control of their training cadre, and the Mid-South instructors had no oversight, except for shooting and weapons-

18

handling instructions at the outdoor ranges. The SEALS brought their own equipment, weapons, and ammunition. They also had their own armorer to repair weapons and select ammunition. Navy range safety officers (RSOs) oversaw the close-quarter combat (CQC) training, determined target placement, and controlled the manner in which the SEALS entered the shoothouses. Sanders testified that the RSOs were required to inspect the shoothouses every day and determine that the conditions were safe for the SEALS to train.

¶31. In January 2008, SEALS Team 5, including SO2 Ghane, traveled to Mid-South to conduct a training cycle. During the January 2008 training cycle, the SEALS armorer selected 5.56 mm "green-tip" rounds to be used for training exercises instead of less powerful "black-tip" or "blue tip" rounds normally used for training. On January 30, 2008, the SEALS were training in the shoothouses, practicing room-clearing. The RSO placed a hostile target on one side of an interior ballistic wall, while the SEALS were "stacked" on the other side of the wall. This resulted in the SEALS who had moved around the wall shooting back at a target on the wall directly in front of the SEALS waiting to enter the room. According to Shaw, this was not standard Navy practice, and a Navy Master Chief expressly had instructed the RSO a few days before January 30 not to put any SEALS behind walls that were being shot at.

¶32. The Investigating Officer also included the following conclusion and recommendation in his report summary:

> Recommend that no charges be brought against the TRADET safety officers on the scene. The ultimate cause of SO2 Ghane's tragic death stems from defective walls that were not ballistic as advertised and paid for in this case. *While multiple factors, including the weather, ammunition, and tactics may have played a role, Navy Special Warfare's inability to detect that the ballistic shoot house was not designed, built, maintained, or tested based on formal objective standards was a systemic and critical failure.* This oversight began

19

the first time any Naval Special Warfare unit used the current shoot house walls approximately six years ago and continued until January 30, 2008. As such, *the Naval Special Warfare shares a collective responsibility in this case*.

(Emphasis added.)

¶33. The commanding officer of NSWC, G. J. Bonelli, transmitted the report via letter dated June 26, 2008, to the Commander, Naval Special Warfare Group One. In that letter, Bonelli endorsed and approved the report, subject to certain comments. Bonelli's comments included the following:

> a. An unfortunate combination of events, to include the misplaced reliance on the integrity of what was thought to be a ballistic wall, *the practice of [redacted] and the use of [redacted] ammunition were variables in this fatal mishap. The exercise of stronger Operational Risk Management (ORM) procedures may have identified a weakness in the risk mitigation that could have been further addressed on the spot on the date of the mishap.*

> b. Recommendation 6 seeks a study of the use of [redacted] ammunition in [redacted] both in training and in combat. My staff and I have looked at this recommendation and I decline to impose an absolute bar on its use. We need to train how we will fight. I accord deference to the combatant commanders in the types of ammunition they believe the warfighters need in theater. That said, we need to carefully evaluate each and every occasion where we train with the [redacted] ammunition.

(Emphasis added.) In other words, Bonelli's recommendation was to allow combatant commanders discretion in choosing which ammunition to train with because the SEALS need to "train how they will fight," even if some ammunition and/or training tactics are more dangerous than others.

¶34. While complaints against government contractors rarely implicate a political question directly, "military decisions that are textually committed to the executive sometimes lie just

20

beneath the surface of the case."[9] It is critical that the court consider not only a plaintiff's claim, but also the defenses that will be presented. The Third Circuit Court of Appeals has explained a court's task in such a case as follows:

> In these situations, the political question appears not from the plaintiff's complaint, but from the broader context made relevant by a contractor's defenses. As such, to avoid infringing on other branches' prerogatives in war-time defense-contractor cases, courts must apply a particularly discriminating inquiry into the facts and legal theories making up the plaintiff's claims as well as the defendant's defenses.[10]

¶35.   The Third Circuit Court of Appeals recently addressed the political-question doctrine in a case involving claims against a government contractor in *Harris v. Kellogg, Brown & Root Servs., Inc.*[11] The court recognized that, while "military control over a contractor's actions is one common way that evaluation of military decisions becomes necessary," the court's inquiry does not end there, because "[p]laintiff's claims might still present unreviewable military decisions if proving those claims or . . . defenses necessarily requires evaluating such [military] decisions."[12]

¶36.   In such cases, when "analyzing whether a proposed defense implicates a nonjusticable political question . . . courts must first decide whether the defendant has 'presented sufficient evidence to permit a jury to conclude that he established the [elements of the] defense by a

---

[9] *Harris v. Kellogg, Brown & Root Servs., Inc.*, 724 F.3d 458, 465 (3d Cir. 2013).

[10] *Id.* at 466 (citing *Lane v. Halliburton*, 529 F.3d 548, 565 (5th Cir. 2008)).

[11] *Harris*, 724 F.3d 458.

[12] *Id.* at 467.

21

preponderance of the evidence.'"[13]  If there is sufficient evidence to support the defense, and the defense introduces a nonjusticiable issue, then the case must be dismissed.[14]  As the court explained in regard to proximate cause:

> If a jurisdiction uses a proportional-liability system which assigns liability by the degree of fault, then a proximate-cause defense introduces a nonjusticiable issue.  In such a system, there is simply no way to determine damages without evaluating military decisions.  The fact finder cannot decide the respective degrees of fault as between a military contractor like KBR and the military without evaluating the decisions made by each . . . .[15]

¶37.  The Fifth Circuit Court of Appeals also addressed the political-question doctrine in the context of claims against a private government contractor in *Lane v. Halliburton*.[16]  On appeal, the court explained that, "[w]e must look beyond the complaint, considering how the [P]laintiffs might prove their claims *and* how [defendant] would defend.  Nonetheless, a court must satisfy itself that political question will certainly and inextricably present itself."[17]

¶38.  The Fifth Circuit explained that "[t]he central issue will be causation.  If we must examine the Army's contribution to causation, 'political question' will loom large."[18]  In *Lane*, the court determined that it could not "say that all plausible facts that would permit the recovery from [defendant] would also raise a political question" and remanded the case for

---

[13]*Id.* at 469 (citing *United States v. Stewart*, 185 F.3d 112, 125 (3rd Cir. 1999)).

[14]*Harris*, 724 F.3d at 469.

[15]*Id.* at 474.

[16]*Lane*, 529 F.3d 548.

[17]*Id.* at 565 (citation omitted) (emphasis in original).

[18]*Id.* at 561.

further proceedings.[19] The court concluded, "the case needs further factual development before it can be known whether the doctrine is actually an impediment," and made clear that "[p]ermitting this matter to proceed now does not preclude the possibility that the district court will again need to decide whether a political question inextricably arises in this suit."[20]

¶39. In this case, the trial court found that causation would be an issue for each of Plaintiff's causes of action and that the "fact finder will be required to evaluate decisions made by the Navy such as the placement of targets, how the soldiers would conduct their exercises, the ammunition, the orders of the Navy as to the building and maintenance and building of the walls of the shoothouse, and continuing the training after allegations that the walls had been breached earlier in making a determination of causation and comparative fault."[21] The trial court further found that it "has a lack of judicially discoverable and manageable standards for resolving this case at least as to the fault of the military." I agree.

¶40. It is well-settled that an accident can have more than one proximate cause.[22] In this case, each of Plaintiff's claims involves a question of causation.[23] Defendants asserted the

---

[19]*Id.* at 566-687, 568.

[20]*Id.* at 554, 568.

[21]On January 28, 2008, Mid-South was notified about a bullet possibly penetrating one of the shoothouse walls. Sanders testified that he and the RSO inspected the wall, but could not find any evidence of penetration. However, out of an abundance of caution, the wall was taken out of service.

[22]*Hill v. Columbus Ice Cream & Creamery Co.*, 93 So. 2d 634, 641-42 (Miss. 1957) ("there may be more than one proximate cause of an accident").

[23]*See Mladineo v. Schmidt*, 52 So. 3d 1154, 1162 (Miss. 2010) ("elements of a negligence claim are duty, breach of duty, proximate cause, and damages"); *Huynh v. Phillips*, 95 So. 3d 1259, 1262 (Miss. 2012) (plaintiff must show that the defendant

23

affirmative defense of comparative negligence in their answer and have made very clear that they intend to defend on the basis that the Navy SEALS' negligence contributed at least in part to SO2 Ghane's death, as they are entitled to do under Mississippi law, whether Plaintiff has alleged that Navy practices contributed to his death or not.[24]  I would find that Mid-South has presented sufficient evidence to support its defense, as the SEALS' own investigation into SO2 Ghane's death concluded that the SEALS bore at least some responsibility.

¶41.    The issue we must decide in this case is not whether Defendants have *proven* that military decisions actually did cause or contribute to SO2 Ghane's death;  rather, the issue is whether Defendants have presented enough evidence to present a *jury question* regarding whether military decisions contributed to SO2 Ghane's death.   The majority finds that Defendants "have failed to demonstrate that the military's training tactics – such as SO2 Ghane's position in the shoothouse, the placement of targets, and the choice of ammunition

---

exclusively controlled the instrumentality causing damage); ***Waggoner v. Williamson***, 8 So. 3d 147, 155 (Miss. 2009) (negligent-misrepresentation claim requires proof of damages as a "direct and proximate result" of reliance on a misrepresentation of material fact); ***Double Quick, Inc. v. Moore***, 73 So. 3d 1162, 1166 (Miss. 2011) (to recover in a premises-liability action, plaintiff must show damages, breach of duty, and that the breach was a proximate cause of the damages); ***Palmer v. Anderson Infirmary Benevolent Ass'n***, 656 So. 2d 790, 796 (Miss. 1995) (negligence per se requires plaintiff to prove proximate causation); ***J. R. ex rel. R. R. v. Malley***, 62 So. 3d 902, 906-07 (Miss. 2011) (negligent infliction of emotional distress requires proof that plaintiff suffered distress as a direct result of defendant's actions); ***Koury v. Ready***, 911 So. 2d 441, 445 (Miss. 2005) (fraud requires proof of proximate causation); Miss. Code Ann. §11-1-63(a)(iii) (Rev. 2002) (products liability claim requires proof of causation); ***Davis v. McGuigan***, 325 S.W.3d 149, 161-162 (Tenn. 2010) (claim under the Tennessee Consumer Protection Act requires proof of a loss of money or property as the result of an unfair or deceptive practice).

[24]*See* Miss. Code Ann. § 85-5-7 (Rev. 2011); Miss. Code Ann. § 11-7-15 (Rev. 2004); ***Fielder v. Magnolia Beverage Co.***, 757 So. 2d 925, 933 (Miss. 1999) (Mississippi law allows for determination of percentage of fault in a civil case).

– exceeded the scope of what Mid-South represented its facility could handle. Military policy and training tactics are therefore irrelevant for purposes of causation." Maj. Op. at ¶ 21. On the record before us, there are questions of fact regarding the extent of Mid-South's representations concerning the ballistic capacity of the wall, whether the failure of the wall was the sole cause of SO2 Ghane's death, and whether the training decisions made by the Navy contributed to SO2 Ghane's death.[25]  In other words, there are jury questions present in this case regarding causation. Although the presence of a jury question prevents a grant of summary judgment in the vast majority of cases, in this case, as the majority recognizes, if a jury is "tasked with apportioning percentage of fault between the Navy and defendants," the jury would "inevitably be required to reexamine military decisions . . . ." Maj. Op. at ¶ 20. It is this reexamination that is prohibited by the political- question doctrine and requires dismissal of Plaintiff's claims.

¶42.    In a proportional-liability jurisdiction such as Mississippi, there "is simply no way" for a fact-finder to determine liability and percentages of comparative fault between the Navy and Mid-South without analyzing decisions made by each – specifically, the Navy's decisions

---

[25]Many of the facts related in our opinion come from the Navy's investigative report and the depositions of Defendants.  I note that the facts recited and conclusions reached by the Navy and Defendants have not been stipulated to, and a jury must consider and is free to give whatever weight it deems appropriate to the evidence presented. ***In re Extension, Enlarging of Boundaries of City of Laurel***, 922 So. 2d 791, 796 (Miss. 2006) ("It is the sole responsibility of jurors to consider and weigh the evidence presented.").  I stress that my conclusion that this case must be dismissed due to the political-question doctrine is not a conclusion that military decisions did in fact contribute to SO2 Ghane's death, but is instead a conclusion that Defendants have presented enough evidence to raise a jury question regarding whether military decisions contributed to SO2 Ghane's death.  Indeed, a jury might very well conclude that military practices played no part in SO2 Ghane's death. However, the political-question doctrine prohibits jury consideration of military decisions.

with respect to training tactics, ammunition used, and inspection of training facilities.[26]  For these reasons, I would affirm the trial court's order granting Defendants' motion for summary judgment based on the political-question doctrine.

**WALLER, C.J., AND COLEMAN, J., JOIN THIS OPINION.**

---

[26]***Harris***, 724 F. 3d at 474.